**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Roosevelt WINFIELD, a/k/a Jihad**
**A. Muhammed, Defendant–**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Luvenia H. WINFIELD, Defendant–**
**Appellant.**

Nos. 92–5457, 92–5466.

United States Court of Appeals,
Fourth Circuit.

Argued March 4, 1993.

Decided June 29, 1993.

John Blanton Farmer, Thompson & McMullan, P.C., Richmond, VA, argued, for appellant Roosevelt Winfield.

Reginald Moore Barley, Richmond, VA, argued, for appellant Luvenia Winfield.

N. George Metcalf, Asst. U.S. Atty., Richmond, VA, argued (Richard Cullen, U.S. Atty., on the brief), for plaintiff-appellee.

Before WILLIAMS, Circuit Judge, SPROUSE, Senior Circuit Judge, and VOORHEES, Chief United States District Judge for the Western District of North Carolina, sitting by designation.

## OPINION

SPROUSE, Senior Circuit Judge:

We review the convictions of Luvenia H. Winfield and her son, Roosevelt Winfield, for various crimes involving drugs proceeds. Both Luvenia and Roosevelt argue that the evidence produced at trial was insufficient to support their convictions under 18 U.S.C. § 371 and 31 U.S.C. §§ 5322 and 5324 for conspiracy to violate the currency transaction reporting ("CTR") requirements. Luvenia also argues that the evidence was insufficient to support four of her nine convictions for money laundering in violation of 18 U.S.C. § 1956.

I

Luvenia Winfield, Roosevelt Winfield, and most of their immediate family were heavily involved in selling illegal drugs in Petersburg, Virginia. Their sales generated large amounts of cash. For example, the Winfield family reported taxable income of $46,904 between 1987 and 1989, while Luvenia was officially unemployed. During that same period they spent approximately $408,673. Much of this money, according to the government's evidence, was laundered by purchasing real estate through intermediaries in financial transactions structured to avoid the CTR requirements of 31 U.S.C. § 5313(a).[1]

On September 10, 1991, a grand jury charged Luvenia and Roosevelt in a nineteen-count indictment. Also charged in the indictment were Mary McDaniel (Luvenia's daughter), James Bruce Winfield (Luvenia's son), Garland W. Harrison (a local businessman), and Roscoe Eubanks, Sr. (a real estate broker). Luvenia was charged in Counts One through Four, Eight, Nine, and Twelve through Sixteen. The counts against her included conspiracy in violation of 18 U.S.C. § 371, various money laundering crimes in violation of 18 U.S.C. §§ 1956 and 1957, and aiding and abetting money laundering in violation of 18 U.S.C. § 2. Roosevelt was charged only in Count One, with conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

Garland Harrison, Mary McDaniel, and James Bruce Winfield pleaded guilty, and Roscoe Eubanks was acquitted. The court denied Luvenia's and Roosevelt's motions for judgment of acquittal. Thereafter, the jury convicted Luvenia of all charges against her and convicted Roosevelt on the Count One conspiracy charge. On appeal, Roosevelt and Luvenia challenge the sufficiency of the evidence on their conspiracy convictions under Count One. Luvenia also challenges the sufficiency of the evidence on her money laundering convictions under Counts Eight, Nine, Fifteen, and Sixteen. We affirm Luvenia's convictions on all counts and reverse Roosevelt's conviction on Count One.

---

1. Section 5313(a) provides:

When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency ..., in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.

The relevant regulation, 31 CFR 103.22(a)(1), provides:

Each financial institution ... shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000. Multiple currency transactions shall be treated as a single transaction if the financial institution has knowledge that they are by or on behalf of any person and result in either cash in or cash out totalling more than $10,000 during any one business day.

## II

■ We first review Luvenia's sufficiency challenges to her convictions on Counts Eight, Nine, Fifteen, and Sixteen for violating 18 U.S.C. § 1956,[2] and, of course, must view the evidence in the light most favorable to the government. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

### COUNTS EIGHT AND NINE

■ Counts Eight and Nine alleged violations of 18 U.S.C. § 1956 in connection with the purchase of 1409 Farmer Street. Count Eight charged that Luvenia, along with James Bruce Winfield and Roscoe Eubanks, purchased that property with proceeds from drug sales and with the intent to promote an illegal activity (drug distribution), in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Count Nine charged that the purchase was designed to conceal the illegal drug proceeds in violation of § 1956(a)(1)(B)(i).[3]

Luvenia concedes that the prosecution proved by overwhelming evidence that she sold illegal drugs and derived substantial income from these sales.[4] She contends, however, that she cannot be convicted of money laundering in relation to 1409 Farmer Street because the evidence showed that she was not involved in the purchase of that property.

■ Roscoe Eubanks, the real estate broker for the transaction, testified that in June 1987 James Bruce Winfield gave him a $10,-000 deposit, divided into two checks for $5,000, for 1409 Farmer Street. Eubanks stated that he had the property titled in the name of James Bruce Winfield and further stated that the money for the purchase did not come from Luvenia. Eubanks also claimed that Garland Harrison was not involved in this transaction.

Garland Harrison, by contrast, testified that Luvenia told him she wanted to buy the Farmer Street property and gave him cash to cover a check for $3,573.63, which he brought to a lawyer and instructed the lawyer to proceed with the paperwork. He did not instruct the lawyer in whose name to place the title and testified that he did not know who took title. The evidence also showed that Luvenia lived at 1409 Farmer Street (until it was condemned in 1988) and that she conducted her drug sales business there. Finally, William Baker testified that Luvenia purchased the property at 1409 Farmer Street and that Luvenia had told him that she was going to evict a tenant from it.

From this evidence, viewed in a light most favorable to the government, a rational jury

2. Section 1956 provides in relevant part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

. . . .

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;

. . . .

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

3. Both of these provisions require the government to prove the defendant's knowledge that the

funds involved in the transaction were proceeds of illegal activity. *United States v. Jackson,* 935 F.2d 832, 838 (7th Cir.1991). In addition, to obtain a money laundering conviction under § 1956(a)(1)(A)(i), the government must prove that the defendant intended to promote the carrying on of "specified unlawful activity," which includes drug distribution. *See* 18 U.S.C. § 1956(c)(7)(A) (incorporating 18 U.S.C. § 1961(1)(D)). Section 1956(a)(1)(B)(i) requires proof "that the transaction was designed to conceal the nature of the proceeds" from the illegal activity. *United States v. Campbell,* 977 F.2d 854, 857 (4th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1331, 122 L.Ed.2d 716 (1993). Luvenia does not appear to contest these elements of proof on appeal. Rather, she contests her alleged connection to the 1409 Farmer Street transaction.

4. Much evidence (including her own testimony) showed that Luvenia obtained money from the drug distribution. In addition to testimony that she was in charge of a drug sales business, the evidence showed her dominance over her family and control of drug acquisition and distribution.

could easily have concluded beyond a reasonable doubt that Luvenia was guilty of laundering money received from drugs sales in relation to 1409 Farmer Street.

### COUNTS FIFTEEN AND SIXTEEN

■ Luvenia also challenges the sufficiency of the evidence on Counts Fifteen and Sixteen for money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) by the purchase of the house at 1361/63 Rome Street. She likewise attacks these convictions on grounds that the evidence did not connect her to the transaction.

The government established at trial that Luvenia purchased the property next door (1357/59 Rome Street) from James Whitley for $16,000 cash delivered in a paper bag. The property was placed in the name of Mary McDaniel, Luvenia's daughter. Jerry Blaha, the owner of 1361/63 Rome Street, testified that he put his property up for sale because of all the drug activity in the neighborhood. He stated that Roosevelt and James Bruce Winfield contacted him about buying the property during the summer of 1988. Later, after another deal arranged by Roscoe Eubanks fell through, Luvenia contacted Blaha about buying 1361/63 Rome Street for $15,000 cash. Blaha stated that he refused to sell to Luvenia because he had been told that doing so might constitute laundering drug money. According to Blaha, Luvenia then asked him if they "couldn't work something out," to which he replied that he could not take her money.

Soon thereafter, Roscoe Eubanks contacted Blaha with a mysterious purchaser, Rosa B. Johnson, who closed on the property on October 27, 1989. Eubanks paid for the property with three cashier's checks totalling $15,000. Rosa B. Johnson testified at trial that she was Luvenia's niece and that she had not purchased the property at 1361/63 Rome Street, nor had she dealt with Eubanks on the transaction. In our view, a

rational jury could find beyond a reasonable doubt from this circumstantial evidence that Luvenia was the true purchaser of 1361/63 Rome Street. *See United States v. Baker,* 985 F.2d 1248, 1257 (4th Cir.1993); *United States v. Tresvant,* 677 F.2d 1018, 1022–23 (4th Cir.1982).

### III

### COUNT ONE

#### (Luvenia and Roosevelt)

■ Count One alleged that the defendants conspired to violate 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(1)(A)(i), and 1957, relating to laundering money; and 31 U.S.C. §§ 5322 and 5324, relating to the reporting requirements. Entitled "18 U.S.C. § 371 Conspiracy to Defraud,"[5] it accused the defendants (including Luvenia and Roosevelt) of conspiring

with each other to commit an offense against the United States, that is, [they] ... conspir[ed] ... to conduct and attempt to conduct financial transactions, well knowing that the property involved in the said financial transactions represented the proceeds of unlawful activity ...

A. which financial transactions involved proceeds of the specified unlawful activity knowing that the transactions were designed in whole and in part to conceal and disguise the nature, source, ownership, location, and control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i),

B. to conduct financial transactions affecting interstate commerce, which financial transactions involved the proceeds of specified unlawful activity, with the intent to promote the carrying on of an unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i),

---

5. 18 U.S.C. § 371, entitled "Conspiracy to commit offense or to defraud United States," states in part:

    If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency

thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

C. to engage in monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000, the currency being the proceeds from a specified unlawful activity, in violation of Title 18, United States Code, Section 1957, [and]

D. to structure a currency transaction to avoid the transaction reporting requirement under Federal law, in violation of Title 31, United States Code, Sections 5322 and 5324.

Despite this language, however, the court instructed the jury only on the theory that Roosevelt and Luvenia conspired to defraud the United States in violation of 18 U.S.C. § 371 by conspiring to obstruct the CTR filing requirements of 31 U.S.C. §§ 5322 and 5324:

> [C]ount one, the conspiracy charge, alleges one purpose of the conspiracy was to defraud the United States. Section 371 of title 18 of [the] United States Code makes it unlawful for any person to conspire to defraud the United States or any agency thereof. This includes any conspiracy whose function is to impair, obstruct or defeat the lawful function of any department or agency of the United States government. To conspire to defraud the government means to cheat the government out of property or money.

6. In instructing the jury, the court primarily adopted the government's proposed instructions.

7. In discussing the burden of proof, the court stated:

> [T]he prosecution carries the burden of proving beyond a reasonable doubt that proceeds that were utilized in particular monetary or financial transactions, which is the basis of the charge of conspiracy to defraud, were actually the proceeds of the selling of illegal drugs by the alleged conspiracy. This goes to the proceedings as to the laundering, which we will get to.
>
> Later, while instructing on the substantive counts, the court explained the money laundering violations. It prefaced its instructions on the substantive counts by stating, "Now, counts— let's get to the laundering transaction, because it is all wound up into the laundering of money."

8. 31 U.S.C. § 5324(a) proscribes structuring transactions to evade reporting requirements:

It went on to instruct that the defendants were charged with conspiring to interfere with the IRS's gathering of "data and reports concerning currency transactions at banks in excess of ten thousand dollars" in violation of 31 U.S.C. §§ 5322 and 5324. Absent were jury instructions concerning a conspiracy to violate the involved money laundering statutes—18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(1)(A)(i), and 1957.[6] The court's only discussion of money laundering was a passing reference to the money laundering theory in its instruction on the burdens of proof and in its preface to the instructions on the substantive counts.[7] Even read as a whole, the instructions do not inform the jury of the elements of conspiracy to violate the laundering statutes in sufficient detail for the jury to understand the requirement for convictions. *See Wells v. Murray,* 831 F.2d 468, 477 (4th Cir.1987).

In view of this and because convictions based on theories not submitted to the jury cannot stand, *McCormick v. United States,* —— U.S. ——, —— n. 8, 111 S.Ct. 1807, 1815 n. 8, 114 L.Ed.2d 307 (1991), the only issue we review is whether the evidence is sufficient to support the defendants' convictions on the theory that they conspired to defraud the United States by conspiring to obstruct the filing of CTR's in violation of 18 U.S.C. § 371 and 31 U.S.C. §§ 5322 and 5324.[8] *See United States v. Mandel,* 862

> No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction—
> (1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a) ...;
> (2) cause or attempt to cause a domestic financial institution to file a report required under section 5313(a) that contains a material omission or misstatement of fact; or
> (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.
>
> 31 U.S.C. § 5322 describes the criminal penalties for a violation of § 5324:
> (a) A person willfully violating this subchapter or a regulation prescribed under this subchapter ... shall be fined not more than $250,000, or imprisoned for not more than five years, or both.
> (b) A person willfully violating this subchapter or a regulation prescribed under this subchapter ... while violating another law of the

F.2d 1067, 1073 (4th Cir.1988) (appellate court can affirm a conviction only if it can say "with a high degree of probability that the jury did not rely on the legally incorrect theory") (quotation omitted), *cert. denied,* 491 U.S. 906, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989); *United States v. Conover,* 845 F.2d 266, 268 (11th Cir.1988) (declining to decide the sufficiency of the evidence on a theory in the indictment on which the jury had not been instructed).

■ The elements of the crime of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 are: (1) the existence of an agreement, (2) an overt act by one of the conspirators in furtherance of the objectives, and (3) intent to agree to defraud the United States. *United States v. Tedder,* 801 F.2d 1437, 1446 (4th Cir.1986), *cert. denied,* 480 U.S. 938, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987). In addition, to be convicted of conspiring to structure transactions to avoid the CTR requirements, a party must have "knowledge of the reporting requirements and act[ ] to avoid them." *United States v. Wollman,* 945 F.2d 79, 81 (4th Cir.1991) (quotation omitted); *see also United States v. Nersesian,* 824 F.2d 1294, 1314 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). Knowledge may be inferred from the surrounding circumstances. *See United States v. Bell,* 954 F.2d 232, 238 (4th Cir.1992).

The evidence, viewed most favorably to the government, certainly established that Roosevelt and Luvenia were involved in a conspiracy to sell drugs—but they were not indicted for this offense. The evidence offered to prove a conspiracy by Roosevelt and Luvenia to violate the CTR requirements presents a closer question and, in our view, compels differing results. We think the circumstantial evidence is sufficient to support Luvenia's conspiracy conviction but insufficient to sustain Roosevelt's conviction.

## LUVENIA WINFIELD

■ The prosecution's evidence of a conspiracy to obstruct the CTR requirements revolves around real estate transactions in Petersburg, Virginia. Garland Harrison, an indicted co-conspirator who pleaded guilty to one count of money laundering, testified that he received money from Luvenia to purchase several different properties in Petersburg. To buy property at 2215 Ferndale Street, she gave Harrison $42,000 in several payments. He placed the property in his name and set up a fictitious lease to her. Luvenia's initial payment to Harrison of $13,000 caused the issuance of a CTR when Harrison deposited the money into his account. Thereafter, Luvenia gave Harrison cash payments of $10,000 or less, Harrison funneled the payments through his nephew's "produce center" (a grocery enterprise then exempt from CTR requirements), and no CTR's issued.[9] From these circumstances alone, it was reasonable for the jury to infer that Harrison and Luvenia had knowledge of the CTR requirements, agreed to avoid them, and acted to avoid them.

Other real estate transactions, conducted in the same fashion, are corroborative. For property located at 103/105 Indiana Lane, Harrison testified that he received a total of $58,500 in incremental cash payments from Luvenia. Among those payments was $15,000 cash received on September 1, 1987, of which Harrison exchanged $9,000 for a produce center check on September 3, 1987. Harrison also converted $10,500 cash into a produce center check and deposited it into his account.[10] As he had done with the property at 2215 Ferndale Street, Harrison

---

United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, shall be fined not more than $500,000, imprisoned for not more than 10 years, or both....

9. Luvenia gave Harrison cash in the following amounts:

$4,000—February 24, 1987
$10,000—February 28, 1987
$4,000—March 5, 1987
$6,000—March 25, 1987

$1,000—April 1, 1987
$1,000—April 10, 1987
$1,000—April 22, 1987
$2,000—April 30, 1987.

10. Harrison's records showed that Luvenia made cash payments to him for 103/105 Indiana Lane in amounts of $10,000, $4,000, $5,000, $15,000, $10,000, $5,000, $4,000, $2,000, $500, and $3,000.

titled the property at 103/105 Indiana Lane in his name and set up a fictitious lease from himself to Luvenia. Harrison further testified that he received $60,000 in payments from Luvenia to purchase a convenience store at 1102/04 Farmer Street. Some of these cash payments he converted into produce center checks. For instance, the government's evidence showed that Harrison received $14,400 cash and converted it into two produce center checks for $7,400 and $7,000. Valarie Randall, who sold the property, testified that Luvenia took over the convenience store operation on the day of the closing. Finally, Harrison's testimony connected Luvenia to the purchase of property at 1409 Farmer Street. As part of that transaction, her son, James Bruce Winfield, gave Roscoe Eubanks $10,000, broken down into two checks for $5,000.

### ROOSEVELT WINFIELD

■ The evidence connecting Roosevelt to a conspiracy to defraud the government by obstructing the filing of CTR's is tenuous at best. Garland Harrison testified that Roosevelt expressed interest on the Winfields' behalf in property on Rome Street and asked if Harrison would purchase it for them. Roosevelt offered $13,000 or $14,000 for the property, with a $5,000 or $6,000 down payment. Harrison testified that he declined Roosevelt's offer because he did not want to buy a home in a drug-infested area.

James Whitley, the owner of the property at 1357/59 Rome Street, testified that a "male Winfield" approached him about buying the property, and they arranged a closing for February 23, 1988. On that date, Whitley testified, the same "male Winfield" appeared for the closing at the Community Bank in Petersburg and told him that Mrs. Winfield would be late. Whitley, however, could not identify Roosevelt at trial as the "male Winfield." Moreover, the bank president, Nathan S. Jones, II, testified that Whitley came to the bank around 2:00 p.m. and, shortly thereafter, two people with a case of cash met him and purchased the property. He did not identify Roosevelt as one of those people. Finally, the Petersburg City Jail records show that Roosevelt was in jail from February 10, 1988, to March 4, 1988, and thus could not have attended the February 23 closing. Although not dispositive, a CTR did issue in this transaction for $16,000.

The only other evidence possibly connecting Roosevelt to a conspiracy to violate the CTR requirements came from Jerry Blaha, the owner of 1361/63 Rome Street. Blaha testified that during the "spring-summer" of 1988, Roosevelt approached him about buying the property. Other evidence showed, however, that Roosevelt was in jail during most of "spring-summer" 1988: from February 10 to March 4, 1988, and again from March 25 to September 15, 1988. Mr. Blaha stated that he refused to sell to the Winfields because he had been told that doing so might constitute laundering drug money. Mr. Blaha testified further that he finally sold the property to "Rosa B. Johnson," a buyer procured by Roscoe Eubanks. Blaha received $14,000 from Eubanks for the property, split into two checks for $5,000 and one for $4,000 *at Blaha's request* so he could deposit them in different accounts. A CTR also issued for this transaction.

A conspiracy "need not and normally will not be [proved] by direct evidence." *United States v. Giunta*, 925 F.2d 758, 764 (4th Cir.1991). In our view, however, the two tangential references to Roosevelt's expression of interest in properties do not provide sufficient evidence for the jury to infer that Roosevelt was involved in a conspiracy to obstruct the CTR requirements. Harrison, who testified on the government's behalf in exchange for lenient treatment, did not testify or even suggest that Roosevelt ever gave him money to purchase property or was involved in any way in structuring a currency transaction to avoid the reporting requirements. Not only does the record lack evidence of Roosevelt's structuring payments to amounts of $10,000 or less, but it also strongly suggests that Roosevelt was incarcerated when most of these incidents occurred. Nor does the record show that Roosevelt was involved with an exempt business enterprise to escape reporting requirements or that he provided money to Harrison to do so. There is simply little, if any, circumstantial evidence

from which the jury could infer that Roosevelt knew of the reporting requirements and agreed to subvert them.

In view of the above, all of the convictions of Luvenia Winfield are affirmed and the conviction of Roosevelt Winfield is reversed.

*AFFIRMED IN PART AND REVERSED IN PART.*