UNITED STATES of America, Appellee,

v.

Mark A. SIMON, Defendant–Appellant.

No. 1110, Docket 95–1514.

United States Court of Appeals,
Second Circuit.

Argued Feb. 28, 1996.

Decided May 29, 1996.

Stephen Robert LaCheen, Philadelphia, PA (Peter Goldberger, Ardmore, PA, of counsel), for Appellant.

Eric Corngold, Assistant United States Attorney (Zachary W. Carter, United States Attorney for the Eastern District of New York, Peter A. Norling, Assistant United States Attorney, Eastern District of New York, Brooklyn, NY, of counsel), for Appellee.

Before: VAN GRAAFEILAND, MESKILL and WINTER, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment of conviction by a jury entered August 18, 1995 in the United States District Court for the Eastern District of New York, Amon, *J.* The defendant, Mark Simon, was convicted of structuring cash transactions to evade currency reporting requirements in violation of 31 U.S.C. §§ 5322 and 5324(3).[1] On appeal, Simon contends that the evidence adduced at trial was insufficient to establish knowledge of illegality, as required by *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). Because we conclude that there was sufficient evidence for a jury to infer knowledge of illegality, we affirm the judgment of conviction.

## BACKGROUND

Between July 18, 1989 and July 25, 1989, Simon, a licensed stockbroker, deposited more than $130,000 in cash into one account through 14 deposits at eight Citibank branches located throughout Brooklyn, Nassau County and Suffolk County, New York. More specifically, on Tuesday, July 18, 1989, he made two deposits of $9,730 and $9,620, respectively, at Plainview, Long Island and Melville, Long Island Citibank branches. On Wednesday, July 19, 1989, he made two deposits of $9,000 and $8,800, respectively, at Hicksville, Long Island and Garden City, Long Island Citibank branches. On Thursday, July 20, 1989, he made four deposits of $9,900, $9,900, $9,920 and $9,900, respectively, at 13th Avenue, Brooklyn, 18th Avenue, Brooklyn, Shore Parkway, Brooklyn and Plainview, Long Island Citibank branches.

---

**1.** Subsequent to the conduct which formed the basis of the indictment, Congress recodified § 5324(1)-(3) as § 5324(a)(1)-(3), without substantive change. Congress also added subsection (b) to impose the prohibitions of subsection (a) in the international currency context. *See* Annunzio–Wylie Anti–Money Laundering Act, Pub.L. No. 102–550, tit. XV, § 1525(a), 106 Stat. 4064 (1992) (codified at 31 U.S.C. § 5324). The grand jury indicted Simon on July 14, 1994 under the law in effect at the time of the conduct charged in the indictment. For consistency and clarity, we refer to the codification in effect at the time of the conduct charged in the indictment. *See* 31 U.S.C. § 5324 (1988 & Supp. V 1993). *See also infra* n.3 (discussing 1994 amendment).

On Monday, July 24, 1989, he made four deposits of $9,900, $9,700, $9,600 and $9,920, respectively, at 13th Avenue, Brooklyn, 18th Avenue, Brooklyn, Shore Parkway, Brooklyn, and Plainview, Long Island Citibank branches. On Tuesday, July 25, 1989, he made two deposits of $9,920 and $5,400, respectively, at Avenue J, Brooklyn and Plainview, Long Island Citibank branches.

Internal Revenue Service Agent Anthony Curieri arrested Simon on March 3, 1992. At trial, Agent Curieri testified that, after Simon signed a waiver of his Fifth Amendment rights, he questioned Simon about the 1989 cash deposits. According to Curieri's testimony, the defendant admitted that "he structured these deposits to conceal the monies from the government and to avoid having, in his words, [the] special $10,000 form filled out." [2]

At trial, the defendant, who did not testify, conceded, through his counsel, that he structured the cash deposits, as described, with the purpose of avoiding the currency reporting requirements. He denied, however, any knowledge that his conduct was illegal. In other words, he conceded knowledge of bank reporting requirements, but denied any knowledge that it was illegal for him to structure transactions with the purpose of avoiding such requirements.

In her charge to the jury, the district judge made it clear that the jury could not convict the defendant unless the jury found beyond a reasonable doubt that the defendant knew that his conduct was illegal. More specifically, she charged the jury as follows:

> The first element of the offense that the government must prove beyond a reasonable doubt is that the defendant knew that Citibank had a duty to report currency transactions in excess of $10,000 and also knew that it was unlawful for the defendant to structure his currency transactions in order to avoid causing such a report to be filed. The act of structuring without knowledge that structuring is unlawful is not a crime.

Similarly, both the prosecution and the defense reminded the jury in summation that the only issue in dispute was whether the defendant knew that his conduct was illegal. The jury convicted.

## DISCUSSION

### I. Standard of Review

In reviewing sufficiency of the evidence claims, "we must view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor, ... and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *United States v. Skowronski,* 968 F.2d 242, 247 (2d Cir.1992) (citations omitted). A defendant challenging the sufficiency of evidence bears "a very heavy burden." *United States v. Nusraty,* 867 F.2d 759, 762 (2d Cir.1989) (quoting *United States v. Young,* 745 F.2d 733, 762 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985)). As we have explained before, if "*any* rational trier of fact could have found the essential elements of the crime,' the conviction must stand." *United States v. Badalamenti,* 794 F.2d 821, 828 (2d Cir.1986) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

### II. Sufficiency of the Evidence

Federal law requires financial institutions to file reports with the Treasury Department of any cash transaction exceeding $10,000. 31 U.S.C. § 5313; 31 C.F.R. § 103.22(a) (1995). Federal law also makes it illegal to structure a transaction for the purpose of evading a financial institution's reporting requirement. 31 U.S.C. § 5324. A person who "willfully" violates the structuring prohibition is subject to criminal prosecution. 31 U.S.C. § 5322.

The Supreme Court recently held that conduct is not "willful" within the meaning of

---

**2.** Defense counsel pointed out, on cross-examination and on appeal, that the agent's contemporaneous report states that the defendant told him that he structured the deposits "to conceal the monies from the government and *avoid filling out* that $10,000 special form."

section 5322 unless the defendant knows that his own conduct is unlawful. *Ratzlaf*, 510 U.S. at ——, 114 S.Ct. at 657. The *Ratzlaf* Court reasoned that because section 5324 itself prohibited *purposeful* structuring and section 5322 authorized prosecution only for *willful* structuring, a prosecution under section 5322 required more than a purpose to circumvent the reporting obligation. *Id.* at ——, 114 S.Ct. at 658. More specifically, the Court reasoned that to avoid rendering the willfulness requirement of section 5322 mere surplusage, section 5322 must be interpreted to require proof that the defendant acted with knowledge that his structuring was unlawful. *Id.* at ——, 114 S.Ct. at 659. Because the district court in *Ratzlaf* had instructed the jury that the government did not have to prove that the defendant acted with knowledge that structuring was unlawful, the Court reversed and remanded for further proceedings consistent with its opinion. *Id.* at ——, 114 S.Ct. at 663.[3]

Thus, "*Ratzlaf* dealt with an abstract jury instruction in yes or no terms; and in its wake, courts and juries must try to answer more concrete questions," *United States v. Hurley*, 63 F.3d 1, 16 (1st Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996), such as what type and quantum of proof is sufficient to support a reasonable inference of willfulness. In *Ratzlaf* itself, the dissenters opined that the majority's knowledge requirement would make structuring prosecutions "difficult or impossible." 510 U.S. at ——, 114 S.Ct. at 669 (Blackmun, *J.*, dissenting). The majority responded with the unremarkable suggestion that knowledge of illegality can be inferred from evidence of the defendant's conduct. *Id.* at —— n. 19, 114 S.Ct. at 663 n. 19.

Courts directly and indirectly addressing this issue in the wake of *Ratzlaf* have concluded that general consciousness of illegality, the method of structuring, and the status

of the defendant can support a reasonable inference of knowledge of illegality. *See Hurley*, 63 F.3d at 16 (concluding that "the thrust of *Ratzlaf*'s wilfulness requirement is met if persons engaged in depositing broken down amounts are generally conscious that their laundering operation is illegal, even if they do not know the precise requirements of the law."); *United States v. Marder*, 48 F.3d 564, 574 (1st Cir.) (stating that the purchase of approximately $10,000 worth of money orders at "three separate banks suggests that [the] defendant had a purpose beyond evasion of the reporting requirement: concealment of his structuring," tending to prove knowledge of illegality), *cert. denied*, —— U.S. ——, 115 S.Ct. 1441, 131 L.Ed.2d 320 (1995); *United States v. Walker*, 25 F.3d 540, 548 n. 8 (7th Cir.) (finding that complex scheme to enlist family members to purchase money orders and cashier's checks in small denominations provided sufficient evidence of knowledge of illegality), *cert. denied*, —— U.S. ——, 115 S.Ct. 371, 130 L.Ed.2d 323 and —— U.S. ——, 115 S.Ct. 531, 130 L.Ed.2d 434 (1994); *United States v. Retos*, 25 F.3d 1220, 1231 (3d Cir.1994) (reversing conviction on improper instruction, but finding that defendant's status provided a sufficient basis to infer knowledge of illegality). However, at least one circuit has criticized such decisions and required evidence of knowledge distinct from the evidence of structuring itself. *United States v. Wynn*, 61 F.3d 921, 928 (D.C.Cir.1995) (disagreeing with *Marder*, 48 F.3d at 574, and *Walker*, 25 F.3d at 548 n. 8). Yet, the *Wynn* Court apparently agreed that the status of the defendant can support an inference of knowledge of illegality. *Id.* (citing *Retos*, 25 F.3d at 1231, with approval).

We recognize that currency structuring is not so "obviously 'evil' or inherently 'bad' " that the act of structuring itself satisfies the willfulness requirement. *See Ratzlaf*, 510 U.S. at ——, 114 S.Ct. at 662. However, we

---

3. *Ratzlaf* overruled Second Circuit precedent, namely, *United States v. Scanio*, 900 F.2d 485 (2d Cir.1990), under which knowledge of the bank reporting obligation and the intent to evade that obligation provided a sufficient basis for conviction. Although Congress subsequently amended the anti-structuring law to conform to the *Scanio* interpretation, *see* Riegle Community Develop-

ment and Regulatory Improvement Act of 1994, § 411, Pub.L. No. 103–325, 108 Stat. 2160, 2253 (1994) (codified at 31 U.S.C. §§ 5322(a), (b), 5324(c)), *Ratzlaf* governed anti-structuring prosecutions for Simon's conduct, which occurred prior to the amendment. *See also supra* n. 1 (discussing 1992 amendment).

also recognize that the *method of structuring* can provide circumstantial evidence of willfulness. As the majority noted in *Ratzlaf*, "[a] jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of *defendant's* conduct." *Id.* —— n. 19, 114 S.Ct. at 663 n. 19 (emphasis added) (citations omitted). And as we have noted repeatedly, a jury may infer "the state of a man's mind from the things he says and does." *United States v. Sweig*, 441 F.2d 114, 117 (2d Cir.), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971); *see also United States v. Sheiner*, 410 F.2d 337, 340 (2d Cir.), *cert. denied*, 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76 (1969).

■ In other words, when the method of structuring suggests a significant effort not only to avoid the bank reporting requirements but to *conceal* the currency structuring *itself* from the authorities, *Ratzlaf*'s requirement of "something more" is satisfied. 510 U.S. at ——, 114 S.Ct. at 657. Although such conduct may support more than one reasonable inference, the trier of fact may choose between reasonable inferences. In reviewing a claim that the government did not present legally sufficient evidence of willfulness, we need only determine if "*any* rational trier of fact could have found" knowledge of illegality. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

■ Moreover, as we have noted in other contexts, "the trier of fact may properly consider the general educational background and expertise of the defendant as bearing on the defendant's ability to form the requisite wilful intent." *United States v. Fletcher*, 928 F.2d 495, 501–02 (2d Cir.) (citations omitted), *cert. denied*, 502 U.S. 815, 112 S.Ct. 67, 116 L.Ed.2d 41 (1991). A jury may infer knowledge of the law from a defendant's education and expertise. *United States v. MacKenzie*, 777 F.2d 811, 818 (2d Cir.1985) ("Defendants' backgrounds (each had a college degree, Roderick in economics and Malcolm in business) also demonstrate the likelihood they knew what the law required."), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986).

■ We conclude that the evidence presented at trial was sufficient to sustain the defendant's conviction for currency structuring. There was sufficient circumstantial evidence for a rational jury to find that the defendant comprehended the unlawfulness of his structuring.

First, and most importantly, we emphasize that this is not a case like *Ratzlaf*, where the court improperly instructed the jury on willfulness. The district court here instructed the jury that the government was required to prove knowledge of illegality. The government and the defense reminded the jury of that requirement.

Second, the defendant's conduct in this case suggests not only knowledge of the reporting requirements and an intent to circumvent those requirements, but knowledge of illegality as well. *Contrast Ratzlaf*, 510 U.S. at ——, 114 S.Ct. at 657 (describing the defendant's efforts in obtaining cashier's checks from at least ten different banks immediately after learning from casino that it would have to file a report if it accepted $100,000 in cash as repayment of gambling debt). Here, the undisputed evidence of the defendant's structuring—of his method of structuring—supports a reasonable inference that the defendant was attempting to conceal not only his deposits, but also his acts of structuring. In other words, a reasonable jury could infer that the extensive efforts undertaken by the defendant in structuring his cash deposits "undoubtedly [were] based on the knowledge that his conduct was unlawful." *Caming v. United States*, 889 F.Supp. 736, 741 (S.D.N.Y.1995).

In structuring his deposits of more than $130,000 in cash, the defendant went to eight different branches of Citibank in Brooklyn, Nassau County and Suffolk County on 14 different occasions over a seven day period. On two separate days, Simon went to four different Citibank branches located throughout two different counties. Simon's decision to make all his deposits in different branches of the same bank rather than in different banks may have been made out of carelessness or convenience or lack of knowledge of how branches assemble information for reporting purposes. The extensive effort Si-

mon did take in structuring these deposits amply supports a reasonable inference that he was attempting to hide his structuring activities because he knew that his conduct was unlawful.

Finally, we note that this defendant is not an unsophisticated person. He was a licensed stockbroker, and he himself was required, as a stockbroker, to file currency transaction reports with the Treasury Department. *See* 31 U.S.C. § 5315; 31 C.F.R. § 103.11(n)(2) (1995). The jury reasonably could have inferred that this defendant possessed the knowledge and sophistication to understand that his own conduct was unlawful. *Retos,* 25 F.3d at 1231; *see Wynn,* 61 F.3d at 928 (citing *Retos* with approval).

To the extent that defense counsel suggests, as he did at trial, that the defendant was attempting to avoid *filling out* the reporting forms himself, *see* n.1, *supra,* the jury logically could reject that explanation, reasoning that the defendant's structuring conduct entailed considerably more effort in time and travel than what is entailed in completing a currency transaction report. To the extent that defense counsel argues that the defendant was merely attempting to avoid scrutiny of his deposits by the IRS, we observe that he would have had a better chance of achieving this objective if he had used different banks or different account names. The defendant's attempts to conceal his activities amply support a reasonable inference that the defendant knew that his own conduct was unlawful. The appellant, in challenging the sufficiency of the evidence, has not borne his "very heavy burden." *Nusraty,* 867 F.2d at 762 (quoting *Young,* 745 F.2d at 762).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

WINTER, Circuit Judge, dissenting:

Respectfully, I disagree with my colleagues as to the sufficiency of the evidence that Simon knew that structuring cash deposits to avoid reporting requirements was illegal. I therefore dissent.

The parties and all members of the panel are in agreement that Simon triggered the obligation of Citibank to report cash transactions exceeding $10,000. 31 U.S.C. § 5313; 31 C.F.R. § 103.22(a) (1995). Indeed, Citibank duly reported Simon's transactions. We also agree that Simon knowingly made separate deposits of under $10,000 in an attempt to evade the daily reporting requirements. 31 U.S.C. § 5324. Simon concedes that he wanted to conceal the aggregate size of the transactions from the government. He readily admitted to that purpose when arrested. What is at issue is whether Simon knew that the structuring of deposits to avoid reporting requirements itself was illegal.

The government paints Simon as a sophisticated stockbroker with knowledge of reporting requirements for currency transactions in excess of $10,000. In its view, Simon conceived of a clever scheme to make separate cash deposits of slightly under that amount at different Citibank branches on the days in question. The very nature of the scheme, the government argues, supports an inference of Simon's knowledge that structuring was illegal. *See Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994).

The scheme was anything but clever, however, and Simon's understanding of the laws regarding the reporting of cash transactions was hardly sophisticated. Simon's fourteen deposits were all made to *a single account in his own name.* For Simon to have expected that daily deposits totalling over $10,000 would not be detected—the government's, and evidently the jury's, view of his purpose—he must have been ignorant of the elementary fact that banks tally all deposits during and at the end of the day in order to determine the balance in an ·account. In short, the government's position is that Simon's sophistication extended to knowledge of the illegality of structuring but did not include a familiarity with bank statements. Discovery of the fact that he had made cash deposits in excess of $10,000 on each of the days in question was thus as inevitable as the sunset. Indeed, the total of the daily cash deposits was reported by the bank, and the government conceded at oral argument that

the reports were precisely what caused Simon's arrest. Far from being a nascent Professor Moriarty, Simon might as well have faxed his deposit receipts to the United States Attorney.

Simon's status as a licensed stockbroker adds nothing to the proof regarding his knowledge of the laws regulating structuring. The government's evidence was only that financial institutions, including stockbrokers, must file reports concerning cash transactions in excess of $10,000. The government offered no evidence as to whether Simon ever received cash from a client, ever filled out such a report, or ever received training as to pertinent statutory or regulatory requirements. The government's proof, in short, was the law itself.

The government's entire case thus rests on inferences to be drawn from Simon's conduct. What is lacking, however, is an explanation of why someone who knew that structuring deposits was illegal would make several cash deposits on the days in question—on one day totaling over $39,000—into a single account in his own name, whether or not separate branches were used.

Simon's conduct is at least as consistent with the lack of knowledge of the illegality of structuring as with that knowledge. Given that his conduct made his arrest inevitable, it is far more consistent with lack of knowledge. When asked at oral argument how Simon's behavior differed from that of a person lacking knowledge of the illegality of structuring, the government speculated that such a person might make separate deposits at the same branch but at different times during the day. However, such a person might also anticipate that a teller at that branch might recognize the depositor as a repeat customer and ask him to fill out a currency transaction report. Indeed, Simon's post-arrest statement suggested exactly that fear.

My colleagues suggest that the jury could have logically rejected the inference that Simon hoped through his efforts only to avoid having to fill out currency transaction forms himself because structuring "entailed considerably more effort in time and trouble" than filling out the reports. I may misunderstand my colleagues' reasoning, but it seems to me unresponsive. Someone who is ignorant of the illegality of structuring but wants to avoid making a currency transaction report might well spend time and effort in going to different branches to achieve that goal.

I realize that Simon's behavior is more than highly suspicious. He had access to large amounts of cash during very brief periods of time, and the likelihood of some kind of past or future serious criminal activity looms large. However, *Ratzlaf*, in overruling our precedents, requires proof beyond a reasonable doubt that Simon knew that structuring was illegal. The government's proof failed to meet this standard. Simon's conduct, the sole evidence offered to show such knowledge, demonstrates at best a belief that form—deposits just under $10,000 at separate branches—would prevail over substance—the aggregate deposits in one day— for purposes of the currency transaction rules. This is not an unreasonable or uncommon belief given our tax or regulatory laws. For example, splitting a large monetary gift between two tax years alters the tax consequences, as does the use of relatively meaningless trusts for estate purposes.

Finally, it ill behooves the government to seek a conviction based on flimsy inferences regarding a defendant's knowledge of the details of currency reporting and structuring laws. The government has refused to adopt proposals that the requirements of these laws be posted in banks. 53 Fed.Reg. 7,948 (1988); 54 Fed.Reg. 20,398 (1988). Such ignorance is presumably fostered in order to identify the depositors and to put them under surveillance in order to locate the sources of cash. The government's failure to post such requirements is surely no defense. Nevertheless, the lack of such notices undermines any assumption that the details of the laws are widely known.

I respectfully dissent.