**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

**No. 96-20402**

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**ROGER W, PIPKIN, III,**

**Defendant-Appellant.**

Appeal from the United States District Court
For the Southern District of Texas

June 2, 1997

Before POLITZ, Chief Judge, DeMOSS, Circuit Judge and JUSTICE,[1]
District Judge.

DeMOSS, Circuit Judge:

Defendant Roger W. Pipkin, III, was convicted of multiple counts of wire fraud, money laundering, and structuring currency transactions so as to avoid reporting requirements. Applying the Supreme Court's recent opinion in *Ratzlaf v. United States*, 114 S. Ct. 655 (1994), we hold that the evidence is insufficient to support a finding that Pipkin knew structuring was illegal. Accordingly, we reverse the structuring convictions. Finding no other reversible error, we affirm all other convictions.

---

[1] District Judge of the Eastern District of Texas, sitting by designation.

## BACKGROUND

Pipkin took part in a scam that defrauded Pioneer Commercial Funding Corporation ("Pioneer") of at least $14 million. Pioneer was a lender which financed residential real estate transactions. Pioneer loaned money to borrowers based on loan packages presented by mortgage brokers. Pioneer did not perform credit checks on the borrowers or appraise the properties itself, but instead relied on the mortgage bankers.

One of the mortgage brokers Pioneer dealt with was Mortgage Credit Corporation ("MCC"), a company Pipkin was associated with. Pipkin and Robert Cartwright, president of MCC, entered into a scheme to defraud Pioneer by submitting phony loan applications. As part of the scheme, MCC prepared loan applications for the purchase of empty lots and non-existent properties. MCC told Pioneer that the properties had great value, and Pioneer loaned money based on the inflated numbers. For example, MCC told Pioneer that a property was appraised at $227,867, when it was really a vacant lot worth $6,000. Based on this deception, Pioneer loaned $153,370 on the property. MCC also used fake buyers on the loan applications. It filled out the applications using the names of Pipkin's friends and acquaintances, paying them nominal amounts (usually $50) to sign the forms.

MCC told Pioneer that it was closing the loans itself and had Pioneer wire the money directly to it. Because the loans were fraudulent, MCC was not actually closing them, but just pocketing the money. Between 1988 and 1989, Pioneer funded approximately

2

1,400 loans for MCC totaling about $93 million. Of this amount, $14 to $17 million was fraudulent. Because of the fraudulent loans, Pioneer was forced into bankruptcy. These fraudulent loan applications form the basis for the conspiracy and wire fraud charges in Counts 1 through 8 of the indictment.

In June 1989, Pipkin purchased a cashier's check for $320,797.97, using a check drawn on an account owned by C & P Realty, a company Pipkin controlled. Pipkin used the cashier's check to buy a house at 5138 Doliver Street in Houston. This purchase forms the basis for the money laundering charges in Counts 9 and 10 of the indictment.

Three times between August and October 1989, Pipkin had an employee cash checks for him. Each time, Pipkin gave the employee three checks, each for slightly less than $10,000. The employee then cashed the checks at the same bank on successive days. By using checks of less than $10,000, Pipkin hoped to avoid triggering the bank's currency transaction reporting requirements. These transactions form the basis for the structuring transaction charges in Counts 11 through 13 of the indictment.

Pipkin was charged in a 13 count indictment with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 (Count 1); seven counts of aiding and abetting the commission of wire fraud in violation of 18 U.S.C. §§ 2 and 1343 (Counts 2 through 8); two counts of laundering money in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) (Count 9) and 1957 (Count 10); and three counts of structuring currency transactions in violation of 31

3

U.S.C. §§ 5313, 5322 and 5324(3) (Counts 11 through 13). Pipkin was convicted on all counts and sentenced to 60 months as to each of Counts 1 through 8, to run concurrent with each other and 78 months as to each of Counts 9 through 13, to run concurrent with each other and concurrent with Counts 1 through 8. In lieu of a fine, Pipkin was ordered to pay $842,000 in restitution. Pipkin filed a timely notice of appeal.

**DISCUSSION**

Pipkin appeals his convictions, arguing that the evidence is insufficient to support his structuring and money laundering convictions, that the indictment should have been dismissed because of Speedy Trial Act violations, that the district court failed to instruct the jury on the issue of materiality in Counts 1 through 10, and that the district court erred in failing to instruct the jury about the impeachment of a prosecution witness. We will address each of these issues in turn.

**Structuring**

Federal law requires banks to file a currency transaction report ("CTR") with the Secretary of the Treasury for any cash

4

transaction over $10,000.   31 U.S.C. § 5313(a);[2] 31 C.F.R. §

103.22(a)(1).[3]  The law also forbids structuring a transaction for

the purpose of evading a bank's requirement to file a CTR.   31

U.S.C. § 5324(3).[4]  At the time Pipkin structured the transactions,

the  law  provided  criminal  penalties  for  anyone  "willfully

violating"  the  anti-structuring  requirements.    31  U.S.C.  §

5322(a).[5]

---

[2]   Section 5313(a) provides that:

> When a domestic financial institution is involved
> in a transaction ... of United States coins or
> currency ... in an amount ... the Secretary [of the
> Treasury] prescribes by regulation, the institution
... shall file a report on the transaction at the time and in the
way the Secretary prescribes.

[3]   Section 103.22(a)(1) provides in relevant part that:

> Each financial institution ... shall file a report
> of each deposit, withdrawal, exchange of currency
> or other payment or transfer, by, through, or to
> such  financial  institution  which  involves  a
> transaction of currency of more than $10,000.

[4]   After  Pipkin's alleged structuring, § 5324(1)-(3) was
reorganized without substantive change as § 5324(a)(1)-(3).   We
will refer to the codification as it existed at the time of the
alleged offense.

Section 5324(3) provides that:

> No person shall for the purpose of evading the
> reporting requirements of section 5313(a) ... (3)
> structure or assist in structuring, or attempt to
> structure or assist in structuring, any transaction
> with one or more domestic financial institution.

[5]   At the time of Pipkin's structuring, § 5322(a) provided
that:

> A person willfully violating this subchapter [31
> U.S.C. § 5311 et seq.] or a regulation prescribed
> under this subchapter (except section 5315 of this

5

The Supreme Court interpreted § 5322(a)'s "willfully violating" provision in *Ratzlaf v. United States*, 510 U.S. 135, 146 (1994), holding that the defendant must know "not only of the bank's duty to report cash transactions in excess of $10,000, but also of his duty not to avoid triggering such a report." In *Ratzlaf*, the defendant, Ratzlaf, ran up a large debt at a casino. He returned to the casino several days later with $100,000 of cash in hand, ready to pay the debt. The casino informed him that all transactions of over $10,000 in cash had to be reported to federal authorities. The casino said that it could accept a cashier's check for the full amount without triggering any reporting requirement. The casino then packed Ratzlaf into a limousine and sent him to area banks. Informed that banks, too, are required to report cash transactions in excess of $10,000, Ratzlaf purchased multiple cashier's checks, each for less than $10,000, and each from a different bank. He then delivered the checks to the casino. *See id.* at 137.

Ratzlaf was convicted of structuring transactions to evade the banks' obligations to file CTRs, in violation of 31 U.S.C. §§ 5322(a) and 5324(3). The district court instructed the jury that while the government had to prove Ratzlaf knew of the banks'

title or a regulation prescribed under section 5315) shall be fined not more than $250,000, or imprisoned for not more than five years, or both.

The law no longer requires a willful violation of the anti-structuring statute. *See* Pub. L. No. 103-325 § 411, 108 Stat. 2160, 2253 (1994), codified at 31 U.S.C. §§ 5322(a) and 5324(c)(1). Pipkin's alleged violations occurred between August and October 1989, so the new law does not apply.

6

reporting requirements, it did not have to prove that he knew that structuring was unlawful. *See Id*. at 137–38.

The Supreme Court reversed the conviction, holding that "to give effect to the statutory `willfulness' specification, the Government had to prove Ratzlaf knew the structuring he undertook was unlawful." *Id*. at 138. The Court stated that, for § 5322(a) purposes, a "willful" actor is "one who violates a known legal duty." *Id*. at 142 (internal quotation omitted). Because "currency structuring is not inevitably nefarious," *id*. at 144, structuring is not "so obviously `evil' or inherently `bad' that the willfulness requirement is satisfied irrespective of the defendant's knowledge of structuring." *Id*. at 146. The Court reaffirmed "the venerable principle that ignorance of the law generally is no defense to a criminal charge. In particular contexts, however, Congress may decree otherwise. That ... is what Congress has done with respect to 31 U.S.C. § 5322(a) and the provisions it controls." *Id*. at 149. Thus, to convict a defendant of structuring, "the jury ha[s] to find he knew the structuring in which he engage[d] was unlawful." *Id*.

Much of the public's ignorance regarding the illegality of structuring must be laid at the feet of the government. The Secretary of the Treasury thought that ignorance of the illegality of structuring was not an element of the crime, so he deliberately avoided publicizing the change in the law. In March 1988, the Secretary considered requiring banks to take steps to inform the public of the new anti-structuring laws. *See* 53 Fed. Reg. 7948

7

(1988).  For example, banks would have been required to place a notice of the requirements at every teller's window, every deposit ticket would have been imprinted with a notice regarding the illegality of structuring, and all bank customers would have received notice of the new law in their bank statement every quarter.  *Id*.  The Secretary withdrew the proposal in May 1989, stating that the notices were unnecessary because it was clear that "the government need only prove that a criminal defendant had actual knowledge of the currency reporting requirements and the specific intent to evade them; the government need not prove that the defendant had knowledge of the structuring prohibitions."  54 Fed. Reg. 20398 (1989); *see **Ratzlaf***, 510 U.S. at 140 n.6 (noting Secretary's actions).

If the Secretary had adopted the proposed rules, our task would be much simpler.  *See **United States v. Simon***, 85 F.3d 906, 911 (2d Cir.) (Winter, J., dissenting), *cert. denied*, 117 S. Ct. 517 (1996).  We would simply hold that given the ample notice provided by his bank, Pipkin knew structuring was a crime.  The Secretary chose not to go that route.  Mistakenly thinking the government would never have to prove knowledge of the illegality of structuring, the Secretary deliberately avoided taking steps to put the public on notice.  That certainly was his prerogative.  It was, however, also a gamble, as ***Ratzlaf*** proves.  Having chosen to keep the public in the dark, the government cannot now argue that everyone knew structuring was illegal.  Instead, it must provide some specific proof that will allow the inference that the

8

defendant knew structuring was a crime.

To support the inference that the defendant knew structuring was a crime, the government must prove "something more" than the fact that a defendant structured his transaction to avoid the filing of a CTR. *See* **United States v. Ismail**, 97 F.3d 50, 58 (4th Cir. 1996); **United States v. Wynn**, 61 F.3d 921, 927-28 (D.C. Cir.), *cert. denied*, 116 S. Ct. 578 (1995); **United States v. Vazquez**, 53 F.3d 1216, 1226 (11th Cir. 1995). For example, the government may show that the "defendant had some special status or expertise from which a jury could reasonably infer that he knew structuring was illegal." **Ismail**, 97 F.3d at 58; *see also* **Simon**, 85 F.3d at 909-10 (defendant, a stockbroker, was familiar with reporting requirements and required to file CTRs as part of his business); **Tipton**, 56 F.3d at 1013 (defendants who were bank officials were familiar with CTR reporting requirements).

Pipkin does not deny that he structured transactions so as to avoid triggering a CTR. Nor does Pipkin deny that he knew of the bank's duty to file a CTR for any cash transaction over $10,000. He contends, however, that the evidence is insufficient to support a finding that he knew that structuring itself was illegal. We agree. At trial, the government provided ample proof that Pipkin knew about CTRs and banks' duties to file them. Indeed, Pipkin admitted as much on direct examination. The government, however, offered no evidence that would support the inference that Pipkin knew of his duty not to structure.

The government presented evidence that Pipkin was involved in

9

the banking industry in the past, even serving as president of a bank in the 1970s. The evidence shows that as bank president Pipkin was responsible for making sure that CTRs were filed. Pipkin's experience in the banking industry does not support an inference that he knew structuring was illegal, however, given the dates of his employment. Banks have been required to file CTRs for over 25 years. *See* Currency and Foreign Transactions Reporting Act, Pub. L. 91-508, Tit. II, 84 Stat. 1118. Structuring trans- actions to avoid triggering a CTR, however, did not become a crime until 1986, a mere three years before Pipkin structured the transactions. *See* Money Laundering Control Act of 1986, Pub. L. 99-570, Tit. I, Subtit. H, § 1354(a), 100 Stat. 3207-22. Pipkin worked for banks in the 1970s, when CTRs were required, but before structuring was illegal. Therefore, the fact that Pipkin knew about CTRs from his banking days is absolutely no evidence that he knew structuring was illegal. Because structuring was legal when he was a banker, if anything, his experience is evidence that he thought structuring was legal.

The record shows that in the late 1980s Pipkin was president of First State Investors, an investment company. There is no evidence that this company was ever required to file a CTR, or that Pipkin became aware of the new anti-structuring laws through his involvement with the company. Likewise, the evidence that Pipkin attended two years of law school is no evidence of his knowledge of the illegality of structuring. He attended before structuring was made a crime, and there is no evidence in the record that he kept

10

up with developments in the law after dropping out of law school.

At least two circuits have held that the fact that a defendant went to lengths to conceal his structuring can provide evidence of his knowledge of its illegality. *See* **United States v. Marder**, 48 F.3d 564, 574 (1st Cir.) (jury can infer knowledge of illegality from concealment), *cert. denied*, 115 S. Ct. 1441 (1995); **United States v. Walker**, 25 F.3d 540, 543, 548 n.8 (7th Cir. 1994) (same). This view has been rejected by at least three circuits, which hold that the evidence of the structuring itself cannot allow the inference that the defendant knew structuring was unlawful. *See* **Ismail**, 97 F.3d at 58 ("we cannot agree that evidence of structuring alone can provide the basis for an inference, proving beyond a reasonable doubt, that a defendant knew that structuring violated the law); **Wynn**, 61 F.3d at 927-28 ("abundant evidence" of structuring itself insufficient to demonstrate knowledge that structuring violated the law); **Vazquez**, 53 F.3d at 1226 ("ample" evidence of structuring failed to prove defendant knew structuring was illegal, only defendant's testimony as to knowledge of illegality allowed finding of willfulness).

While we are sympathetic to the Fourth, Eleventh and D.C. Circuits' view that the structuring itself cannot allow an inference of knowledge of illegality, we need not enter this debate because there is no evidence that Pipkin went to great lengths to hide his structuring. During the three structuring episodes, he simply had an employee cash checks of slightly less than $10,000 each. No effort was made to use multiple checks of smaller amounts

11

to avoid attracting notice of his structuring activity. *Cf*.

***Marder***, 48 F.3d at 564 (fact that defendant used three checks to structure $11,460 transaction, rather than just two, is evidence of concealment). Nor were different accounts used, or the checks made out to different individuals. Pipkin's scheme was so obvious that a teller at the bank noted his behavior and, unbeknownst to him, prepared a CTR. On the form, she noted that this was the "5th time in 2 weeks" that such a transaction had been made. Thus, even if we were to hold that the structuring itself could provide proof of knowledge, given Pipkin's lack of concealment, there is no evidence to support such an inference in this case.

The record is devoid of evidence which would support an inference that Pipkin knew structuring was illegal. Therefore, the evidence is insufficient to prove that he structured transactions in violation of 31 U.S.C. §§ 5322(a) and 5324(3). Accordingly, his convictions on Counts 11, 12 and 13 must be reversed.[6]

**Money Laundering**

Pipkin was convicted of laundering money in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) (Count 9) and 1957 (Count 10).[7] Pipkin

---

[6] Pipkin also argues that the jury was not properly instructed that the government must prove that he knew structuring was illegal. Because the evidence is insufficient to support the structuring convictions, we do not address the jury instruction issue. Accordingly, we express no opinion as to the correctness of the charge.

[7] Pipkin does not appeal his conviction on Count 10. The conduct charged in Counts 9 and 10 was similar: buying the cashier's check. The only real distinction is the concealment element under Count 9.

12

argues that the evidence is insufficient to convict him on Count 9, which involved purchasing the $320,797.97 cashier's check using a check drawn on the account of one of his companies, C & P Realty. The cashier's check was then used to purchase the house at 5138 Doliver Street. To obtain a conviction under § 1956(a)(1)(B)(i),[8] the government must prove that Pipkin: (1) conducted or attempted to conduct a financial transaction, (2) which he knew involved the proceeds of unlawful activity, (3) with the intent either to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity. *See **United States v. West***, 22 F.3d 586, 590-91 (5th Cir. 1994).

Pipkin does not deny that the evidence is sufficient to support a finding that he conducted a financial transaction which he knew involved the proceeds of unlawful activity. He does,

---

[8]  Section 1956(a)(1)(B)(i) provides that:

(a)(1)  Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity --

\*\*\*

   (B) knowing that the transaction is designed in whole or in part --

      (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity

\*\*\*

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

however, argue that the evidence is insufficient to support an inference that he did so with intent to conceal. Pipkin contends that he merely purchased a cashier's check using a check signed by him. The check was drawn on an account of a corporation he owned, and the evidence shows he made no secret of his ownership. The check was used to purchase a house, which he then occupied. Pipkin contends that he used a cashier's check to pay for the house because title companies will not take personal checks at closings. Because his purchase of the check was "open and notorious," **United States v. Dobbs**, 63 F.3d 391, 397 (5th Cir. 1995), Pipkin asserts, the evidence is insufficient to show he concealed the transaction. We disagree.

Under our Circuit's law, concealment can be established by showing that "the transaction is part of a larger scheme designed to conceal illegal proceeds." **United States v. Ismoila**, 100 F.3d 380, 390 (5th Cir. 1996), *petition for cert. filed* (Mar. 31, 1997) (No. 96-8492). As we said in **United States v. Willey**, "it in not necessary to prove ... that the particular transaction charged is itself highly unusual...." **United States v. Willey**, 57 F.3d 1374, 1386 (5th Cir.), *cert. denied*, 116 S. Ct 675 (1995). "Indeed, viewed in isolation, many transactions charged as money laundering could not be classified as 'unusual' financial transactions. Those who would launder illegal proceeds frequently use cash, personal checks, or cashier's checks to pay for the assets or to make the transfers that are charged as money laundering." **Id**. at 1386 n.23. In determining whether there is a larger scheme to conceal

14

proceeds, the defendant's use of "a third party, for example, a business entity or a relative, to purchase goods on [her] behalf ... usually constitutes sufficient proof of a design to conceal." *Id*. at 1385.

The facts of this case prove that Pipkin's purchase of the cashier's check was more than an innocent isolated transaction. Rather, the purchase was part of a larger scheme designed to conceal illegal proceeds. In buying the Doliver Street house, Pipkin led the owner to believe that he was purchasing the house in trust for his children, using a third party as trustee. The trustee then purchased the house with the understanding between himself and Pipkin that he would eventually transfer the house into Pipkin's name. At the closing, the owner was given the $320,797.97 cashier's check Pipkin bought. The check was payable to the Aspen Mortgage Company, in order to pay off the prior mortgage on the house. After the trustee bought the house, a lease agreement was prepared showing that Pipkin was leasing the house from the trustee. The house was then transferred to Sam Houston Oil and Gas, a corporation which Pipkin controlled. The record reflects that Sam Houston Oil and Gas never conducted any business, but was a shell corporation.

Given these numerous, complicated transactions, many involving third parties (including a shell corporation), there is abundant evidence of Pipkin's concealment. Therefore, the evidence is sufficient to support Pipkin's conviction of money laundering in Count 9.

15

**Speedy Trial Act**

Pipkin asserts that his trial did not begin until 917 days after his initial appearance. Pipkin argues that because of this delay, the district court erred in not dismissing the indictment pursuant to the Speedy Trial Act, 18 U.S.C. § 3161 *et seq*. Pipkin failed to move for dismissal of the indictment prior to trial. He therefore waived his right to dismissal under the Speedy Trial Act. *See* 18 U.S.C. § 3162(a)(2) ("Failure of the defendant to move for dismissal prior to trial ... shall constitute a waiver of the right to dismissal under this section."); *United States v. Bradfield*, 103 F.3d 1207, 1220 (5th Cir. 1997).

**Materiality Instruction**

In *United States v. Gaudin*, 115 S. Ct. 2310 (1995), the Court held that where materiality is an element of the offense, a defendant has a constitutional right to have the jury instructed on the question of materiality. Pipkin contends that the district court erred in not instructing the jury that any misrepresentations he made in the wire fraud scheme were material misrepresentation. Assuming, without deciding, that the wire fraud statute, 18 U.S.C. § 1343, requires that the misrepresentations be material,[9] there is still no error. The jury was properly instructed that it was to determine whether the misrepresentations were material. *See United States v. McGuire*, 99 F.3d 671, 672-73 (5th Cir. 1996) (en banc),

---

[9] *See United States v. Faulhaber*, 929 F.2d 16, 18 (1st Cir. 1991) (finding no materiality requirement in 18 U.S.C. § 1341, the mail fraud statute).

16

*petition for cert. filed*, 65 U.S.L.W. (U.S. Jan. 29, 1997) (No. 96-1206).

**Impeachment of Witness Instruction**

Pipkin argues that the district court erred in refusing to include in the charge an instruction regarding impeachment by evidence of untruthful character.  During the trial, a witness testified that Cartwright, president of MCC and a key government witness against Pipkin, was not an honest person and is a "very good con man."  Pipkin's defense was that Cartwright, not Pipkin had committed the crimes, and that Cartwright was lying.

As part of that strategy, Pipkin asked that the jury be given the following instruction:

> You have heard the testimony of Robert Cartwright. You also heard testimony from others concerning their opinion about whether that witness is a truthful person or the witness's reputation, in the community where the witness lives, for telling the truth.  It is up to you to decide from what you heard here whether Robert Cartwright was telling the truth in this trial.  In deciding this, you should bear in mind the testimony concerning the witness's reputation for truthfulness as well as all the other factors already mentioned.

The district court refused to give this instruction, and instead gave a general instruction regarding the credibility of witnesses. As part of that instruction, the district court told the jury that:

> You are the sole judges of the credibility or "believability" of each witness and the weight to be given the witness's testimony.  An important part of your job will be making judgments about the testimony of the witnesses including the defendant who testified in this case.  You should decide whether you believe what each person had to say, and how important that testimony was.

17

District courts have "substantial latitude in formulating the jury charge," *United States v. Laury*, 49 F.3d 145, 152 (5th Cir.), *cert. denied*, 116. S. Ct. 162 (1995), and we review refusals of requested jury instructions for abuse of discretion. We reverse "only if the requested instruction (1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that failure to give it seriously impairs the defendant's ability to effectively present a given defense." *United States v. Gray*, 105 F.3d 956, 967 (5th Cir.) (internal quotations and citations omitted), *cert. denied*, 117 S. Ct. 1326 (1997). In essence, our inquiry is whether "the defendant was improperly denied an opportunity to convey his case to the jury." *Laury*, 49 F.3d at 152.

Instructions regarding the credibility of witnesses was substantially covered in the charge the district court gave and Pipkin was not improperly denied an opportunity to convey his case to the jury. *See* *Laury*, 49 F.3d at 152 (failure to give instruction on substance abuse by a witness not grounds for reversal when jury was given the general credibility instruction); *United States v. Moore*, 786 F.2d 1308, 1316 (5th Cir. 1986) (no error in denying instruction regarding witness's psychiatric condition when judge gave jury general credibility instruction). Therefore, the district court did not abuse its discretion in refusing to give the requested instruction.

**CONCLUSION**

The government did not prove that Pipkin knew that structuring was a crime.  Therefore, under **_Ratzlaf v. United States_**, 114 S. Ct. 655 (1994), the evidence is insufficient to support his structuring convictions.  Accordingly, we **REVERSE** the structuring convictions on Counts 11 through 13 and **VACATE** the sentences on these counts.  The district court committed no other reversible error, so we **AFFIRM** all other convictions and sentences.