UNITED STATES of America, Appellee,

v.

Timothy B. GIBBONS, Appellant.

No. 91–3033EALR.

United States Court of Appeals,
Eighth Circuit.

Submitted April 15, 1992.

Decided June 29, 1992.

William McArthur, Little Rock, Ark. (argued), for appellant.

Richard M. Pence, Asst. U.S. Atty., Little Rock, Ark. (argued), for appellee.

Before ARNOLD, Chief Judge, FRIEDMAN,* Senior Circuit Judge, and LOKEN, Circuit Judge.

* DANIEL M. FRIEDMAN, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

**DANIEL M. FRIEDMAN, Senior Circuit Judge.**

The appellant, Timothy B. Gibbons, challenges his convictions of mail fraud, wire fraud, structuring currency transactions and criminal contempt on two grounds: (1) the evidence was insufficient to support the jury verdict and (2) the court improperly gave a supplemental instruction in response to a jury inquiry. We reject both contentions, and affirm.

### I.

In April 1990, Gibbons and co-defendant Mark B. Hopkins incorporated Union National Mortgage Company (Mortgage Co.) as an Arkansas company. The company was not registered with the Arkansas Securities Department as a mortgage loan company and was not authorized to engage in that business. [TR 17–20, 25] The only business Mortgage Co. conducted was the purchase and sale of bonds issued or guaranteed by the United States. Gibbons' Florida license to sell securities had been revoked in October 1989. [TR 14–15]

In a suit by the Securities and Exchange Commission, the United States District Court for the Eastern District of Arkansas in August 1990 issued a preliminary injunction against Gibbons, Hopkins and Mortgage Co., barring them from making material misrepresentations or omissions of material facts in connection with the purchase or sale of securities and from transferring or disposing of any money or property they owned, possessed or controlled. [TR 355, 374] In November 1990, Gibbons was charged with criminal contempt for violating the preliminary injunction.

Gibbons and Hopkins were indicted in January 1991 in 10 counts. They were both charged with one count of conspiracy to commit mail and wire fraud (18 U.S.C. § 371 (1988)), three counts of mail fraud (18 U.S.C. § 1341 (Supp. II 1990)), and three counts of wire fraud (18 U.S.C. § 1343 (Supp. II 1990)). Gibbons also was charged with one count of structuring cur-

rency transactions for the purpose of evading currency transaction reporting requirements (31 U.S.C. § 5324(3) (1988)). At the government's request, two other counts were dismissed. The indictment and the criminal contempt charge were consolidated for trial.

The jury acquitted both defendants of the conspiracy charge, convicted Gibbons of the substantive counts and of criminal contempt. It convicted Hopkins of one count of wire fraud, was unable to render a verdict with respect to him on another wire fraud count, and acquitted him on the remaining substantive counts. Gibbons was sentenced to twenty-seven months imprisonment on each of the seven counts on which he was convicted, the sentences to run concurrently, and to six months imprisonment on the criminal contempt charge, to run concurrently with the sentences under the indictment. He was not fined, because of his lack of assets.

The facts supporting the jury verdict are described in Part II below. In brief, Gibbons' scheme to defraud involved the making of numerous misrepresentations in connection with the purchase and sale of substantial amounts of United States government issued or guaranteed bonds.

## II.

### *Sufficiency of the Evidence*

A. *The mail and wire fraud counts.* Gibbons contends that his convictions on the mail and wire fraud counts cannot stand because the evidence does not show his intent to defraud, which the district court instructed the jury it must find to convict. According to Gibbons, he merely engaged in so-called "free riding" (trading without any funds) [TR 58, 77, 78, 180] or "pairing off," in which profits or losses on a purchase are offset against profits or losses on a contemporaneous sale. [TR 81, 97, 177–78] Gibbons states that this is a legal and widely-accepted method of speculating in bond transactions and, therefore, that he lacked the necessary intent to defraud.

Viewing the evidence most favorably to the government, which Gibbons recognizes is the standard of review when the sufficiency of the evidence to support a criminal conviction is challenged, [Bl.Br. 15] *United States v. Brown,* 921 F.2d 785, 791 (8th Cir.1990), the evidence was more than sufficient to support the jury's determination that Gibbons committed mail and wire fraud.

■ Representatives of six brokerage firms, with whom Gibbons dealt, testified about the misrepresentations he made to them in connection with those dealings. Four of these firms suffered losses totalling $222,000 in their dealings with Gibbons; the other two did not sustain losses. The following examples of Gibbons' misrepresentations are illustrative, not exhaustive.

1. *Westcap Government Securities, Houston Tex.* (Westcap). On the day that Mortgage Co. was incorporated, Gibbons, identifying himself as Hopkins, opened an account with Westcap. [TR 105] He stated that after seven months, he had obtained approval from Mortgage Co.'s board of directors to do business with Westcap; [TR 105, 106] that Mortgage Co. was a mortgage banker that had made a lot of loans and had a net worth of $5 million. [TR 105–6] Gibbons subsequently sold $3 million in bonds to Westcap, [TR 109, 112] and stated that the bonds were being held in Mortgage Co.'s account at the North Palm Beach office of Shearson, Lehman, Hutton, Inc., (Shearson). [TR 107, 123] The bonds were not delivered on the settlement date, [TR 113, 124] and Westcap lost more than $22,000. [TR 113, 125, 136] Gibbons previously had worked for a short time at Westcap. [TR 124] If the Westcap employees had known they were dealing with Gibbons, they would not have done business with Mortgage Co. [TR 108, 124]

2. *Josephthal and Company, New York, N.Y.* (Josephthal). Gibbons sold $3 million in bonds to Josephthal and Company. [TR 213–14] When the bonds were not delivered, a Josephthal employee spoke to someone at Mortgage Co., who identified himself as either Gibbons or Hopkins and

who stated that there had been a mixup in delivery and that the bonds would be delivered from Shearson. [TR 221–22] Thereafter, Josephthal received a mailogram from Mortgage Co., stating that it had not opened an account with Josephthal and that all purported transactions were cancelled. [TR 222–23] The bonds were never delivered. [TR 225] Josephthal suffered a loss of more than $40,000 on this transaction. [TR 224–5]

3. *Pittsburgh Investment Brokers, Pittsburgh, Pa.* (Pittsburgh). Gibbons, pretending to be Hopkins, told Pittsburgh that Mortgage Co. was a subsidiary of Union National Bank of Little Rock, Arkansas, and that it was trading in U.S. Treasury Securities to hedge against a portfolio of $18 to $20 million in bonds held at Shearson. [TR 231–32] Gibbons engaged in two series of transactions with Pittsburgh. The first involved a purchase of $18 million in bonds, offset by a sale of bonds—transactions on which Mortgage Co. made a profit of $62,000 [TR 236] and Pittsburgh suffered no loss. [TR 233] In the second series of transactions, Gibbons sold $18 million in bonds to Pittsburgh. [TR 234] Gibbons, again pretending to be Hopkins, represented that the bonds would be delivered from Shearson. [TR 235] The bonds were not delivered, and Pittsburgh suffered a loss of more than $76,000. [TR 236]

4. *MGSI Securities, Houston, Texas* (MGSI Securities). Gibbons, purporting to be Hopkins, stated that Mortgage Co. had spoken to an MGSI Securities salesman eight or nine months previously, [TR 141, 144] but that at that time, Mortgage Co.'s board of directors had not approved doing business with MGSI Securities. [TR 143] Gibbons represented that Mortgage Co. was a mortgage loan origination company, that it had experienced explosive growth, was originating $20 to $30 million in loans per month, and had $5 million in capital. [TR 142] MGSI Securities taped this telephone conversation and the tape was played for the jury. [TR 149, 150]

Three days later, Gibbons, again purporting to be Hopkins, sold to MGSI Securities $3 million in U.S. Treasury Bonds. [TR 145] Subsequently, Gibbons, again purporting to be Hopkins, sold another $3 million in U.S. Treasury Bonds to MGSI Securities. [TR 186, 187] The person with whom he dealt on this second transaction, James Ogg, was the former president of Westcap. Ogg recalled that Westcap had fired Gibbons after he had worked there for approximately one week [TR 191] and stated that he would not have entered into the transaction had he known that [TR 191] Gibbons was involved.

Although Gibbons, purporting to be Hopkins, twice told MGSI Securities that the bonds would be delivered from Shearson, [TR 148, 189] the bonds were not delivered. [TR 146, 149, 189] Subsequently, MGSI Securities received a telegram from Mortgage Co.'s attorney stating that Mortgage Co. had not opened an account with MGSI Securities and that all transactions were cancelled. [TR 165, 191–2] As a result, MGSI Securities lost more than $81,000. [TR 193–4]

As the foregoing evidence (and the other evidence in the record we have not discussed) shows, Gibbons was not convicted of mail and wire fraud for unsuccessful attempts to engage in "free riding" and "pairing off," as he contends. The jury convicted him because overwhelming evidence showed that he deceptively and intentionally engaged in flagrant misrepresentations in connection with the purchase and sale of securities, and that he had no intention to consummate those transactions if doing so would have resulted in a loss rather than a profit. The evidence establishes Gibbons' fraudulent intent and fully supports the jury verdict that he committed mail and wire fraud.

Gibbons contends, however, that the district court erred in denying his motion for a directed verdict, made at the close of the prosecution's case, because at that time the evidence did not show his participation in the substantive mail and wire fraud offenses. Although he does not amplify the argument, presumably his theory is that when the prosecution rested it had not established that it was Gibbons and not Hop-

kins who made the misstatements in the conversations with the bond brokers.

Most of the bond brokers testified that the person with whom they dealt on the telephone identified himself as Hopkins. In testifying in his own defense, however, Gibbons admitted that it was he, and not Hopkins, who conducted the phone conversations. [TR 609–10, 622, 635–36] Hopkins confirmed that he had not spoken to the brokers. [TR 655–6, 683–4]

■ The government's case in chief, however, included evidence that Gibbons and not Hopkins made the statements. The government introduced a telegram from Josephthal to Mortgage Company's attorney, which referred to telephone conversations between a Josephthal employee and Gibbons in which Gibbons placed the order to sell bonds [TR 224]. Woodall, who did various work for Mortgage Co., took his orders from Gibbons [TR 393]. He overheard Gibbons on an incoming telephone call from Pittsburgh identify himself as Hopkins while conducting bond business. Hopkins was present in the room during the conversation; Woodall left shortly after it began [TR 395, 413–414]. There was sufficient evidence on the record at the close of the prosecution's case to support the district court's denial of Gibbons' motion for a directed verdict.

■ B. *The Criminal Contempt Conviction.* The preliminary injunction, issued in August 1990, enjoined Gibbons from making misrepresentations in connection with the purchase or sale of securities and froze his assets. [TR 374] In clear violation of the injunction, Gibbons, trading as Atlantic Financial Company (Atlantic), [TR 36, 37] continued the prohibited practices in October and November of 1990.

In October 1990, Gibbons opened an account for Atlantic with U.S.F. & G. Investment Services, Naples, Florida (U.S.F. & G.). Gibbons represented that Atlantic was a financial consulting firm with approximately 30 employees, [TR 302, 304] that he had not had any problems with a securities license, [TR 310] and that he was interested in liquidating treasury bonds that the firm had in its account at Shearson. [TR 302–3,

304] Atlantic sold $8 million in bonds to U.S.F. & G., [TR 272–3] which were not delivered. [TR 306] U.S.F. & G. lost more than $44,000 on the transaction. [TR 306, 308] Gibbons also had opened an account for Atlantic with Shearson in October 1990. [TR 269–270]

In November 1990, Gibbons opened an account for Atlantic with First Albany Corporation, Albany, New York (First Albany). He told First Albany that Atlantic basically functioned as a money manager and purchased and sold $10 million in bonds weekly [TR 287]. The next day, Gibbons sold $4 million in bonds to First Albany. [TR 293] The latter became suspicious and, on checking with the Securities and Exchange Commission, was informed of the preliminary injunction and the freeze order. [TR 294–5] First Albany then cancelled the sale, informing Gibbons that it did so because the freeze order prevented him from paying for the transaction. [TR 296] First Albany suffered a loss of $2500 on the transaction. [TR 297–8]

This and other evidence in the record fully supports the jury's conclusion that Gibbons committed criminal contempt by willfully violating the preliminary injunction.

C. *The Currency Structuring Conviction.* Under 31 U.S.C. § 5313(a) (1988) and the implementing regulations (31 C.F.R. § 103.22(a)(1) (1991)), banks are required to report all currency transactions involving more than $10,000. Section 5324 of Title 31 provides that:

> No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction—
>
> *     *     *     *     *     *
>
> (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

A person who "willfully violat[es]" this provision commits a crime. 31 U.S.C. § 5322 (1988).

"By its plain language, § 5324(3) is violated when an individual structures a currency transaction with the intent to evade § 5313's reporting requirements." *United States v. Scanio,* 900 F.2d 485, 489 (2d Cir.1990). "[A] criminal violation of § 5324(3) may be established without proof that the defendant knew that structuring is unlawful." *Id.* at 491. The requirement in § 5322 that for structuring a currency transaction to be criminal the defendant must have acted "willfully," "is satisfied by proof that (s)he (1) knew that the bank was legally obligated to report currency transactions exceeding $10,000 and (2) intended to deprive the government of information to which it is entitled." *Id. See also United States v. Dashney,* 937 F.2d 532, 538–39 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991).

Under the foregoing principles, with which we agree and which we adopt, the evidence is sufficient to support the jury's verdict that Gibbons willfully violated 31 U.S.C. § 5324(3) by structuring a currency transaction. "In reviewing the jury's verdict, we give the government the benefit of all inferences that may reasonably be drawn from the evidence." *United States v. Marin–Cifuentes,* 866 F.2d 988, 992 (8th Cir.), *cert. denied,* sub nom. 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989).

The evidence that supports the jury's verdict on this charge is as follows:

On the day the Securities and Exchange Commission filed its suit for a preliminary injunction, and after the Commission informed Mortgage Co.'s attorney of the filing, [TR 372, 445] Gibbons directed an associate, Richard Woodall, to withdraw from Mortgage Co.'s account at Worthen Bank as much cash as possible and to obtain the balance in cashier's checks. [TR 400–401] Woodall withdrew $19,000 in cash and obtained a cashier's check for $55,910.84, payable to Gibbons [TR 329, 347, 401–2, 404, 444] and turned them over to Gibbons. [TR 404–5]

At approximately 6:00 PM that day, [TR 332] Gibbons and his wife, Paula, went to a branch office of the Worthen Bank to cash the cashier's check. [TR 329, 428] The branch office had only $3,000 in cash. [TR 428] Gibbons requested the bank to issue a cashier's check to Paula for $52,910.84 and pay the balance in cash. [TR 333, 334]

Gibbons asked whether his ex-wife could trace the cashier's check, since she would want some of the money. The bank employee stated that the only way the funds could be traced would be through a currency transaction report, which would be required for a currency transaction exceeding $10,000. [TR 429] Gibbons then requested the bank to issue six cashier's checks to Paula, five for $9,000 each, and the sixth for $7920.84, [TR 335, 428, 429] instead of the single cashier's check for $52,910.84, he previously had requested.

The branch office issued the six checks, [TR 335] which Paula cashed the next day. [TR 342] The branch office did not complete a currency transaction report at that time because there was no currency transaction exceeding $10,000. [TR 430, 431] The bank, however, subsequently issued a currency transaction report covering Paula for the six checks. [TR 345]

This evidence supports the jury verdict that Gibbons structured "a currency transaction with the intent to evade § 5313's reporting requirements." *Scanio,* 900 F.2d at 489. Gibbons originally requested the bank's branch office to issue to his wife a cashier's check for $52,910.84. He asked whether that check could be traced and was informed that it could be through a currency transaction report, which was required for currency transactions exceeding $10,000. He then took the initiative in changing the transaction, requesting the bank to issue, in lieu of the single cashier's check for more than $50,000, six separate cashier's checks, each for less than the $10,000 amount that would trigger the reporting requirements.

These facts justified the jury's conclusion that Gibbons willfully structured the transaction to evade the reporting requirements. Not until the bank informed Gibbons that currency transactions exceeding $10,000 had to be reported did Gibbons request the bank to issue six checks, each for less than

$10,000, in place of the single check for more than $52,000 he originally requested. The jury justifiably inferred that the reason he made this change was to avoid the bank reporting a currency transaction involving the larger amount. Since the receipt and cashing of six checks would have been less efficient and convenient than receiving and cashing one, it is difficult to explain this change except that Gibbons sought to evade the reporting requirements.

The method by which Gibbons attempted to achieve that objective was precisely the evil that Congress sought to deal with in the structuring prohibition. "[Section] 5324 was enacted in 1986 to close a loophole in the Bank Secrecy Act of 1970 which enabled structuring, or 'smurfing,' rings to launder large amounts of ill-gotten currency by engaging in multiple currency transactions, each under $10,000, within a brief period of time." *Scanio*, 900 F.2d at 491. It is immaterial that Gibbons' apparent purpose for doing this was to prevent his ex-wife rather than the government from tracing the funds. The focus of the statute is on the structuring person's conduct, not on the reason why he did not want the transaction report filed. It is similarly irrelevant that the checks were not cashed until the next day and that Gibbons' scheme ultimately failed, because the bank issued a currency transaction report for the six checks. Section 5324(3) broadly prohibits "structur[ing]" or "assist[ing]" or "attempt[ing] to structure or assist in structuring." The structuring or attempt to structure violates the statute even if ultimately a currency exchange report on the transaction is issued.

## III.

### The Supplemental Jury Instruction.

Paragraphs 1–12 of Count I of the indictment charged conspiracy, identified the defendants, and then described the scheme to defraud that the conspiracy involved. Each of the six substantive counts charging mail and wire fraud, of which Gibbons was convicted, merely "reallege[d] all of the allegations contained in paragraphs 1 through 10 of count I of this indictment."

The district court instructed the jury that since a person cannot conspire with himself, the verdict on the conspiracy charge must be identical for both defendants, namely, it must find either both of them innocent or both of them guilty. [TR 771–2] With respect to the mail and wire fraud counts, however, the court instructed the jury to consider each defendant and the evidence against him separately and individually, and that the verdict on one of the defendants should not control the verdict on the other. [TR 775] The jury took the court's written instructions with it into the jury room.

During its deliberations, the jury sent the following note to the court:

If we understand correctly the Court's instructions, Count No. I must be both guilty or both innocent. Count No. II states the same as Count No. I, items 1 through 10, plus mail fraud. Does the decision of Count I mean that we have to rule the same on the remaining counts, such as No. II, which states that everything from Count No. I, items 1 to 10. In other words, may we find opposite verdicts for counts on each individual after No. I except for the contempt, which we realize only pertains to Mr. Gibbons. [Tr. 791]

Over Gibbons' objection, [TR 793–4] the court gave the following written answer to the jury:

You are correct as to Count I.

With respect to those remaining counts wherein both defendants are charged (Counts II, III, IV, V, VI and VIII), the fact that you might find one defendant guilty or not guilty of a charge contained in one of those counts should not control your verdict as to the other defendant. You may find both not guilty; one guilty and the other not guilty; or both guilty, according to your view of the evidence. Your verdict on Count I should not control your verdict as to any other count. You must note the elements of each of the crimes charged and then determine if

the Government has proved each of those elements beyond a reasonable doubt, considering each defendant separately.

The incorporation of some of the language of Count I in certain other counts is the Government's means of charging the "scheme to defraud" it is relying [on] as a basis for the "mail fraud" and "wire fraud" charges. Note instructions 16, 17, 18, and 19 which set forth the statutes involved and the elements required to be proved in connection with the mail fraud charges (Counts II, III and V) and the wire fraud charges (Counts IV, VI, and VIII). One or both of the defendants may have had a scheme to defraud. It is not necessary that you find both had such a scheme in order to convict one. If one defendant had a scheme to defraud and the other was unaware thereof then it is permissible to find the one who had such a scheme guilty assuming the Government has proved all the elements of the crime charged beyond a reasonable doubt. [TR 794–795]

Gibbons challenges the supplemental instruction on two grounds: (A) the instruction was unnecessary, since its substance already had been given in the original instructions and (B) the instruction was improper because it failed to include other portions of the original instructions that were favorable to Gibbons, such as the presumption of innocence.

■ A. "The response to a jury request for supplemental instructions is a matter within the sound discretion of the district court." *United States v. White,* 794 F.2d 367, 370 (8th Cir.1986). Although the district court might have "responded [to the jury inquiry] by referring the jurors to the original jury instructions," *id.,* as it did in *White,* the court did not abuse its discretion in giving the supplemental instruction, the correctness of which Gibbons does not challenge. "When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States,* 326 U.S. 607, 612–613, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946).

The jury obviously was confused by the repetition in the substantive counts of the description of the scheme to defraud set forth in paragraphs 1–10 of the conspiracy count and the court's instruction that under the conspiracy count, the jury was required either to acquit or to convict both defendants. The jury apparently was uncertain, despite the court's original instruction, whether it had to follow the same rule in deciding the substantive counts. The district court cannot be faulted for explaining in detail that the jury should consider separately the evidence against each defendant under the substantive counts. The court's decision to follow that course was not an abuse of discretion.

■ B. "A trial judge must be painstakingly impartial any time he communicates with the jury during deliberations. He must insure that any supplemental instructions are accurate, clear, neutral, and non-prejudicial." *United States v. Skarda,* 845 F.2d 1508, 1512 (8th Cir.1988). The supplemental instruction met those requirements.

The instruction answered the precise question the jury had asked and did so clearly, objectively, and nonprejudicially. The court was not required "to reiterate instructions favorable to the defense." *Id.* The decision whether to do that "is one committed to the sound discretion of the trial court." *Id.*

The district court twice pointed out in the supplemental instruction that the government was required to prove all the elements of the substantive counts beyond a reasonable doubt. The court was not required to repeat all of the instructions favorable to Gibbons and it did not abuse its discretion in declining to do so.

The judgment of the district court is affirmed.