UNITED STATES of America,
Appellant,

v.

William MacPHERSON,
Defendant–Appellee.

Docket No. 04–4825 CR.

United States Court of Appeals,
Second Circuit.

Argued: May 6, 2005.

Decided: Sept. 13, 2005.

Jeffrey A. Goldberg, Assistant United States Attorney (David C. James, Assis-

tant United States Attorney, on the brief), for Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Brooklyn, New York, for Appellant.

Robert M. Simels (Alexandra Vandoros, on the brief), New York, New York, for Defendant–Appellee.

Before: RAGGI, WESLEY, and CUDAHY,[1] Circuit Judges.

RAGGI, Circuit Judge.

After trial, a jury found William Mac-Pherson guilty of structuring a quarter-million dollars into thirty-two separate cash transactions, each less than $10,000, in violation of 31 U.S.C. § 5324(a)(3). Nevertheless, the United States District Court for the Eastern District of New York (Sterling Johnson, Jr., *Judge*) set aside the verdict and entered a judgment of acquittal, *see* Fed.R.Crim.P. 29(c), ruling that the trial evidence was insufficient to establish the requisite *mens rea* elements of the charged offense, specifically, MacPherson's knowledge of and intent to avoid federal currency reporting requirements for cash transactions exceeding $10,000. The United States appeals, arguing that the totality of the circumstantial evidence permitted the jury to infer Mac-Pherson's guilty knowledge and intent. We agree and, accordingly, reverse the judgment of acquittal and remand the case to the district court with directions that it reinstate the jury verdict, proceed to sentencing, and enter a judgment of conviction.

## I. *Background*

### A. *The Structured Cash Deposits*

At times relevant to this case, William MacPherson was a New York City police

---

1. The Honorable Richard D. Cudahy, of the United States Court of Appeals for the Sev-
enth Circuit, sitting by designation.

officer who supplemented his salary with rental income from various real estate holdings. In a four-month period between September 26, 2000, and January 16, 2001, MacPherson deposited a total of $258,100 in cash into three Staten Island bank accounts by means of thirty-two transactions, structured so that no single transaction exceeded $10,000. We here detail the chronology of these deposits, grouping those occurring on the same day.

| | | | |
|---|---|---|---|
| 1. | 9/26/00 | Citibank | $9,000 |
| 2. | 9/27/00 | Citibank | $8,000 |
| 3. | 9/28/00 | Citibank | $3,000 |
| 4. | 10/2/00 | Independence | $9,000 |
| 5. | 10/2/00 | Chase | $9,000 |
| 6. | 10/2/00 | Citibank | $9,000 |
| 7. | 10/11/00 | Independence | $9,000 |
| 8. | 10/11/00 | Chase | $9,000 |
| 9. | 10/11/00 | Citibank | $9,000 |
| 10. | 10/18/00 | Independence | $9,000 |
| 11. | 10/18/00 | Chase | $9,000 |
| 12. | 10/18/00 | Citibank | $9,000 |
| 13. | 11/1/00 | Independence | $9,000 |
| 14. | 11/1/00 | Chase | $9,000 |
| 15. | 11/1/00 | Citibank | $9,000 |
| 16. | 11/7/00 | Independence | $9,000 |
| 17. | 11/7/00 | Chase | $9,000 |
| 18. | 11/7/00 | Citibank | $9,000 |
| 19. | 11/13/00 | Independence | $9,000 |
| 20. | 11/13/00 | Chase | $9,000 |
| 21. | 11/13/00 | Citibank | $9,000 |
| 22. | 12/28/00 | Independence | $4,000 |
| 23. | 12/28/00 | Chase | $5,500 |
| 24. | 12/28/00 | Citibank | $8,000 |
| 25. | 1/5/01 | Independence | $4,400 |
| 26. | 1/5/01 | Chase | $9,200 |
| 27. | 1/5/01 | Citibank | $9,200 |
| 28. | 1/8/01 | Citibank | $9,100 |
| 29. | 1/10/01 | Chase | $9,000 |
| 30. | 1/16/01 | Independence | $2,000 |
| 31. | 1/16/01 | Chase | $8,700 |
| 32. | 1/16/01 | Citibank | $7,000 |

### B. The Background to the Structured Deposits

#### 1. MacPherson's Attempt to Shield Assets from a Civil Judgment

At trial, the government did not contend that the deposited funds derived from any criminal activity. Rather, it suggested that the deposits were made with monies that MacPherson had previously shielded against a possible civil judgment. To support this theory, the government adduced the following evidence.

In December 1997, MacPherson was sued for $2.5 million by an individual who was injured at one of his rental properties. MacPherson was uninsured against a possible damages award. Starting in January 1998 and continuing for some years thereafter while the tort suit was pending against him, MacPherson liquidated or transferred significant assets in an apparent effort to shield them from judgment. For example, between January 1998 and September 2000, MacPherson sold five real properties for just under $1 million, realizing a net profit of approximately $343,000. He also made four large cash withdrawals totaling $220,000 from a Citibank account held jointly with his wife. The first withdrawal, for $80,000, was on January 21, 1998, from a branch located at 577 Bay Street on Staten Island. The other three cash withdrawals were all made on August 31, 1999: $50,000 from the aforementioned Bay Street branch; another $50,000 from a branch at 1492 Hylan Boulevard on Staten Island; and $40,000 from a branch at 1910 Victory Boulevard, also on Staten Island.

In September 2000, MacPherson settled the pending tort suit for $27,000. That same month, he made the first three of the charged structured deposits.[2]

---

**2.** MacPherson argues that, with the settlement of the tort case, any interest he may

## 2. The CTR Filings with Respect to MacPherson's 1998–99 Cash Withdrawals

Because MacPherson's large cash withdrawals in 1998 and 1999 each exceeded $10,000, Citibank was required by law to document them to the Internal Revenue Service, *see* 31 U.S.C. § 5313; 31 C.F.R. § 103.22(b)(1); *infra* Part II.B.1, which it did by filing a Form 4789 Currency Transaction Report ("CTR"). The January 21, 1998 CTR reported the persons involved in the cash transaction as William J. MacPherson and his wife, Tracy A. MacPherson.[3] The bank verified Mr. MacPherson's identity by reference to his New York State driver's license. Mrs. MacPherson's identity was verified by reference to her Citicard number. Edith Steuerman, a Citibank Manager, testified that she filled out most of the MacPhersons' January 21, 1998 CTR, with a teller filling out other parts. Although Steuerman had no specific recollection of the MacPherson transaction—for example, she could not recall if Mrs. MacPherson was actually present on the occasion—she testified that her uniform practice in preparing CTRs was to have the customer sit down across from her at a desk while she took down identifying data.

Steuerman did not prepare any of the August 31, 1999 CTRs, and no persons involved in their preparation were called to testify. Nevertheless, the CTR filed in connection with the $50,000 cash withdrawal from the Bay Street branch itself indicates that Mr. MacPherson was the sole person involved in that transaction and that his identity was verified on this occasion by reference to his Citicard number. The Hylan Boulevard CTR of the same date indicates that both MacPhersons were involved in that $50,000 cash withdrawal, with their identities verified by reference to their driver's licenses. The Victory Boulevard CTR similarly indicates the involvement of both MacPhersons in that $40,000 withdrawal, with their identities again verified by their driver's licenses.

## C. Procedural History

At the close of the prosecution case, MacPherson moved pursuant to Fed. R.Crim.P. 29(a) for a judgment of acquittal, arguing that the government had failed to prove that, at the time of the charged cash deposits, he knew that banks were

---

have had in sheltering his cash assets ended, leaving him without any motive to avoid federal reporting requirements. We will not speculate as to what may have prompted MacPherson to engage in the charged structuring. Motive is not an element of the crime, and, thus, the lack of evidence on this point does not, as a matter of law, preclude conviction. We recognize, of course, that evidence of motive, or the lack thereof, is a factor that a jury may weigh in considering whether the totality of the circumstances permits it to infer guilty knowledge and intent beyond a reasonable doubt. *See United States v. Simon*, 425 F.2d 796, 808 (2d Cir.1969) (Friendly, J.); *see also* 1 Leonard B. Sand et al., *Modern Federal Jury Instructions: Criminal*, Instruction 6–18 (2004). For the reasons discussed herein, however, we conclude that the evidence in this case was sufficient, even

without proof of motive, to support a jury finding that MacPherson structured the charged cash transactions with the knowledge and intent required to support conviction.

3. Approximately two years later, Mr. MacPherson became a licensed real estate salesperson. Like banks, real estate agents are required by law to file CTRs when dealing in cash transactions exceeding $10,000. *See* 31 U.S.C. § 5312(a)(2)(U). No evidence was adduced, however, indicating that, in his professional capacity, Mr. MacPherson ever engaged in a cash transaction requiring a CTR filing. Similarly, although Mrs. MacPherson worked as a banker, it appears that her employer did not deal in cash transactions so as to require CTR filings.

required to report cash transactions in excess of $10,000.[4] The court denied the motion, observing that Steuerman's testimony about her practice of filling out CTRs in the presence of the customer involved in the cash transaction could support a jury inference that MacPherson acquired the necessary knowledge when he made the 1998 cash withdrawal of $80,000, for which Steuerman filed a CTR.

After the jury returned a verdict of guilty, MacPherson renewed his motion for a judgment of acquittal, *see* Fed.R.Crim.P. 29(c), challenging the sufficiency of the government's evidence of his knowledge of and intent to evade currency reporting requirements. This time, the court granted the motion, offering the following explanation:

> I have thought long and hard about this particular case even while the trial was going on and I was ready to grant a Rule 29 at the conclusion of the government's case but I said no, I'll let it go to the jury; if the jury comes back with a verdict of not guilty, that settles it, but they came back with a verdict of guilty
> . . . .
>
> I'm persuaded by the argument of the defendant that I don't think the government's evidence in this case was sufficient to warrant a conviction so therefore I'm going to grant the Rule 29 and the government can appeal my decision.
>
> I do not mean to substitute my judgment for the judgment of the jurors, however, as a matter of law, I think it's insufficient.

Tr., July 21, 2004, at 9–10.

The government appealed.

## II. *Discussion*

### A. *Standard of Review*

We review the district court's grant of a judgment of acquittal *de novo, see United States v. Espaillet,* 380 F.3d 713, 718 (2d Cir.2004), applying the standard established in *Jackson v. Virginia,* which asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this stern standard, a court, whether at the trial or appellate level, may not "usurp[ ] the role of the jury," *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir.2003), by "substitut[ing] its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury," *United States v. Guadagna,* 183 F.3d 122, 129 (2d Cir.1999) (internal quotation marks omitted). A court may grant a judgment of acquittal only if it is convinced that "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna,* 183 F.3d at 130 (internal quotation marks omitted). That is not this case.

### B. *The Totality of the Circumstantial Evidence Would Permit a Rational Jury to Find the Knowledge and Intent Elements of Structuring Proved Beyond a Reasonable Doubt*

#### 1. *The Federal Law Prohibiting Structuring*

Preliminary to discussing the evidence from which a reasonable jury could have found the requisite knowledge and intent

---

**4.** Although MacPherson did not, at this time, specifically challenge the sufficiency of the government's proof of his intent to evade the CTR filing requirement, we understand that argument to be implicit in his knowledge challenge.

proved in this case, we briefly review the evolution of federal law prohibiting structuring.

In 1970, Congress enacted the Currency and Foreign Transactions Reporting Act ("CFTRA" or "the Act"), Pub.L. No. 91–508, Tit. II, 84 Stat. 1118, also referred to as the "Bank Secrecy Act," which requires, *inter alia*, that domestic financial institutions report to the Internal Revenue Service any cash transactions exceeding $10,000, *see id.* § 221, 84 Stat. at 1122 (current version at 31 U.S.C. § 5313(a)); 31 C.F.R. § 103.22(b). Underlying this legislation was Congress's recognition of "the importance of reports of large and unusual currency transactions in ferreting out criminal activity." *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 38, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) (citing legislative history); *see also United States v. Scanio,* 900 F.2d 485, 487 (2d Cir.1990) (further discussing legislative history). No criminal predicate as to the source of cash in excess of $10,000 was required to prosecute those who failed to comply with the specified reporting requirements. *See* CFTRA § 209, 84 Stat. at 1121 (establishing criminal penalty for willful violations of the Act).

Prior to 1986, the law did not explicitly prohibit persons from structuring cash transactions so that no one transaction exceeded $10,000 in an effort to avoid CTR filings. Although such structuring was sometimes prosecuted under 18 U.S.C. § 371 as a scheme to defraud the United States, *see, e.g., United States v. Winfield,* 997 F.2d 1076, 1082–83 (4th Cir.1993); *United States v. Nersesian,* 824 F.2d 1294, 1309–10 (2d Cir.1987), in 1986, Congress decided to address the problem directly by specifically criminalizing structuring in the Money Laundering Control Act § 1354(a), Pub.L. No. 99–570, Tit. I, Subtit. H, 100 Stat. 3207, 3207–22 (codified as amended

at 31 U.S.C. § 5324). Title 31 U.S.C. § 5324 states, in pertinent part:

> No person shall, for the purpose of evading the reporting requirements of section 5313(a) ... or any regulation prescribed under any such section ... (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

31 U.S.C. § 5324(a). The applicable regulations define "structuring" by reference to both the *actus reus* and *mens rea* elements of § 5324(a):

> [A] person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under section 103.22 of this Part. "In any manner" includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.

31 C.F.R. § 103.11(gg).

Originally, only a person who "willfully" violated the prohibition on structuring was subject to criminal penalties. CFTRA § 209, 84 Stat. at 1121 (codified at 31 U.S.C. § 1058, *repealed and replaced by* Act of Sept. 13, 1982 §§ 1, 5(b), Pub.L. No. 97–258, 96 Stat. 877, 1000, 1081 (codified as amended at 31 U.S.C. § 5322(a) (1994))). This court construed this willfulness ele-

ment to require proof that a defendant, with knowledge of the reporting requirement imposed by law, structured a currency transaction "intend[ing] to deprive the government of information to which it is entitled." *United States v. Scanio,* 900 F.2d at 491. In *Ratzlaf v. United States,* the Supreme Court took a different view, ruling that structuring was "willful" only if the government further proved "that the defendant acted with knowledge that his conduct was unlawful." 510 U.S. 135, 137, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). Within the year, Congress responded by eliminating willfulness as an element necessary to convict a person of structuring in violation of § 5324. *See* Riegle Community Development and Regulatory Improvement Act of 1994 § 411, Pub.L. No. 103–325, 108 Stat. 2160, 2253 (codified as amended at 31 U.S.C. §§ 5322(a), (b), 5324(c)). The net result, as this court has previously observed, was to conform federal anti-structuring law "to the *Scanio* interpretation." *United States v. Simon,* 85 F.3d 906, 909 n. 3 (2d Cir.1996).

■ Because the conduct at issue in this case all occurred well after 1994, we look to *Scanio* to identify the three elements that the government was required to prove beyond a reasonable doubt to convict MacPherson of the charged § 5324 offense: (1) the defendant must, in fact, have engaged in acts of structuring; (2) he must have done so with knowledge that the financial institutions involved were legally obligated to report currency transactions in excess of $10,000; and (3) he must have acted with the intent to evade this reporting requirement. *See id.; see also* 3 Leonard B. Sand et al., *Modern Federal Jury Instructions: Criminal,* Instruction 50B–21 (2004).[5]

**5.** The record indicates that the jury in this case was properly charged as to these ele-

### 2. The Circumstantial Evidence Supported an Inference of MacPherson's Knowledge of and Intent to Evade Currency Reporting Requirements

As noted in our discussion of the case's procedural history, MacPherson did not argue in the district court, nor does he assert in opposition to the government's appeal, that the trial evidence was insufficient to permit a reasonable jury to find the first element of a § 5324 offense—acts of structuring—proved beyond a reasonable doubt. Indeed, the evidence would not support such an argument. Instead, MacPherson argued, and it appears the district court concluded, that the government's proof failed at the second and third elements: knowledge and intent. Accordingly, we focus our sufficiency discussion on these two aspects of *mens rea.*

### a. Inferring Knowledge and Intent from Circumstantial Evidence

■ The record is devoid of any direct evidence that MacPherson knew of or intended to evade the reporting requirements for cash transactions exceeding $10,000. The law, however, recognizes that the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom. *See, e.g., Ratzlaf v. United States,* 510 U.S.135, 149 n. 19, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (noting that "jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct"); *United States v. Salameh,* 152 F.3d 88, 143 (2d Cir.1998) (recognizing that "as a general rule most evidence of intent is circumstan-

ments.

tial"); *United States v. Nersesian,* 824 F.2d at 1314 (noting that "'finding of knowledge that is largely inferential is not impermissible'" (quoting *United States v. Sheiner,* 410 F.2d 337, 340 (2d Cir.1969))). Indeed, the law draws no distinction between direct and circumstantial evidence in requiring the government to carry its burden of proof. *See United States v. Glasser,* 443 F.2d 994, 1006–07 (2d Cir. 1971). A verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable. *See United States v. Morgan,* 385 F.3d 196, 204 (2d Cir.2004). The possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to sufficiency analysis because "it is the task of the jury, not the court, to choose among competing inferences." *Id.* (internal quotation marks omitted); *see United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000) (noting that where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter" (internal quotation marks and brackets omitted)). Indeed, in *United States v. Nersesian,* 824 F.2d at 1314, discussed further *infra* Part II.B.2.b, this court specifically rejected the argument that possible innocent explanations for certain events precluded a jury from drawing therefrom a reasonable inference that the defendant possessed the requisite knowledge of and intent to evade currency reporting requirements.

Applying these principles to this case, we conclude that the totality of circumstantial evidence permitted a jury to find beyond a reasonable doubt that MacPherson engaged in the charged structuring with the requisite guilty knowledge and intent. Specifically, the jury could have reasonably inferred from the pattern of MacPherson's structuring, as well as from the record of his earlier cash withdrawals that did generate CTR filings, that MacPherson knew of and, in connection with the charged deposits, intended to evade currency reporting requirements.

b. *The Pattern of MacPherson's Cash Transactions Supported a Jury Inference of Knowledge and Intent*

(1) *United States v. Nersesian Recognizes that Knowledge of and Intent to Evade Reporting Requirements Can Be Inferred from a Pattern of Structured Transactions*

The government submits that the jury could have inferred MacPherson's guilty knowledge and intent from the pattern of his structured transactions. This argument finds support in our decision in *United States v. Nersesian. See id.* at 1314–15. In that case, a defendant and co-conspirators had used $117,000 in cash to purchase more than one hundred $1,000 money orders at numerous banks throughout New York City over a one-month period. *See id.* at 1309. In challenging the sufficiency of the evidence supporting his conviction for conspiring to defraud the government by engaging in cash transactions aimed at avoiding currency reporting requirements, *see* 18 U.S.C. § 371, the *Nersesian* defendant argued that the pattern of his transactions could not support an inference that he knew of and intended to evade CTR filing requirements. *See United States v. Nersesian,* 824 F.2d at 1310. He specifically noted that his money order purchases did not fall "just short of" the $10,000 reporting trigger, no evidence indicated that he had ever been alerted to the CTR filing requirement, and certain evidence in the case was actually inconsistent with such knowledge. *Id.* at 1314. This court acknowledged that "the evidence does permit the inference that [the defendant] did

not know of the reporting requirements." *Id.* Nevertheless, given the pattern of transactions, the court could not conclude that the evidence was insufficient to permit "*any* rational trier of fact" to find knowledge and intent: "The jury could have inferred from the fact that [the defendant] chose to carry out his currency exchanges in a series of small transactions over a number of days, rather than in a single transaction or several larger transactions, that he knew of the reporting requirements and was attempting to avoid them." *Id.* at 1314–15 (emphasis in original); *see also United States v. Winfield,* 997 F.2d at 1082 (holding, in § 371 prosecution, that defendant's knowledge of the currency reporting requirements "may be inferred from the surrounding circumstances").

### (2) *Nersesian's Reasoning Supports the Jury Verdict in This Case*

Applying *Nersesian*'s reasoning to this case, we conclude that the jury that convicted MacPherson could have reasonably inferred from the fact that the defendant chose to deposit a quarter-million dollars through a series of thirty-two small transactions all under $10,000 that he knew of the reporting requirements applicable to cash transactions over $10,000 and was intent on avoiding them. The trial evidence indicated that the $258,100 at issue did not represent income earned during the four-month period so as to require multiple deposits. Rather, the evidence suggested that the cash was a long-held asset that MacPherson had shielded for some years from a possible tort judgment. Once the tort suit was settled in September 2000, MacPherson apparently concluded that there was no further risk in placing this cash in bank accounts traceable to him. Nevertheless, he deliberately decided not to deposit the money in one lump sum or even through several five-figure transactions. Instead, he employed the more burdensome technique of thirty-two separate transactions, no one of which exceeded $10,000. As the Seventh Circuit observed in a similar context, "it is unlikely, to the point of absurdity, that it was pure coincidence" that a defendant would engage in multiple transactions, all under $10,000, to achieve his purpose. *United States v. Cassano,* 372 F.3d 868, 879 (7th Cir.2004) (referring to fifty-one checks under $10,000 cashed by the defendant), *vacated on other grounds,* —— U.S. ——, 125 S.Ct. 1018, 160 L.Ed.2d 1037 (2005) (citing *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)).

That MacPherson's avoidance of five-figure transactions was calculated rather than coincidental is evidenced by the fact that twenty-three deposits were in amounts of $9,000–$9,200. Indeed, in six out of seven consecutive weeks, MacPherson traveled to three different banks on the same day to make identical deposits of $9,000, thereby providing even stronger circumstantial evidence than existed in *Nersesian* that the defendant knew of and was intent on avoiding the $10,000 trigger for CTR filings. *Cf. United States v. Nersesian,* 824 F.2d at 1314 (rejecting argument that knowledge and intent could not be inferred because monies were not structured in amounts "just short" of the reporting trigger). In sum, MacPherson's willingness to sacrifice efficiency and convenience in depositing a quarter-million dollars through multiple small transactions structured to ensure that no one exceeded $10,000 amply supported a reasonable inference that MacPherson knew of and was intent on avoiding CTR reporting requirements. *See generally United States v. Gibbons,* 968 F.2d 639, 645 (8th Cir.1992) (observing that, because "receipt and cashing of six checks would have been less efficient and convenient than receiving and cashing one, it is difficult to explain this

change except that Gibbons sought to evade the reporting requirements"). As such, the jury verdict of guilty should not have been set aside.

### (3) MacPherson's Arguments for Not Applying Nersesian's Reasoning to This Case Are Unconvincing

In urging affirmance of the district court's judgment of acquittal, MacPherson submits that Nersesian's reasoning is inapplicable to his case because the Nersesian defendant was convicted of violating 18 U.S.C. § 371, which did not require the government to prove the elements of structuring under 31 U.S.C. § 5324. We are not convinced. Although the first element of a § 5324 offense—acts of structuring as defined in 31 C.F.R. § 103.11(gg)—may not have been an element of the § 371 charge in Nersesian, as we have already noted, the sufficiency of the government's proof as to that § 5324 element is not here at issue. As to the remaining knowledge and intent elements of § 5324, they are, in fact, identical to the mens rea elements in Nersesian. As this court there observed, to convict the defendant of the charged § 371 conspiracy, the government was required to prove that he "knew there was a reporting requirement for currency transactions in excess of $10,000 and intended to evade that requirement." United States v. Nersesian, 824 F.2d at 1314. Precisely because Nersesian addressed the same mens rea elements as are here at issue, its recognition that knowledge and evasive intent could reasonably be inferred from the pattern of structured transactions is appropriately applied to sufficiency review in this case.

This conclusion is reinforced by the fact that, even when the government's mens rea burden in a § 5324 prosecution was heavier, requiring proof of willfulness as defined in Ratzlaf, this court ruled that a jury could infer the requisite knowledge of illegality from the pattern of structured transactions. In United States v. Simon, we stated that "a reasonable jury could infer that the extensive efforts undertaken by the defendant in structuring his cash deposits undoubtedly were based on the knowledge that his conduct was unlawful." 85 F.3d at 910 (internal quotation marks and brackets omitted). MacPherson submits that Simon is distinguishable because the defendant in that case conceded his knowledge of and intent to evade the currency reporting requirements; his sufficiency challenge went only to the element of willful illegality. But, as the government convincingly argues in response, evidence sufficient to establish willful illegality necessarily supports the lesser scienter requirement at issue in this case. Thus, we conclude that it does not matter whether a structuring defendant's sufficiency challenge focuses on his knowledge of CTR filing requirements, his intent to evade these requirements, or (in the case of pre-amendment offenses) his knowledge that such evasion was illegal; as Nersesian and Simon make plain, a reasonable jury may well be able to infer the necessary mens rea from the pattern of structured cash transactions. See also United States v. Cassano, 372 F.3d at 879; United States v. Beidler, 110 F.3d 1064, 1069 (4th Cir.1997) (holding that "evidence that a defendant has structured currency transactions in a manner indicating a design to conceal the structuring activity itself, alone or in conjunction with other evidence of the defendant's state of mind, may support a conclusion that the defendant knew structuring was illegal" (emphasis added)); United States v. Wynn, 61 F.3d 921, 927 (D.C.Cir. 1995) (holding that defendant's purchase of multiple cashier's checks in amounts less than $10,000 to conduct transactions in larger amounts "created an inference that he was motivated to avoid the reporting

requirement"); *United States v. Gibbons,* 968 F.2d at 645; *cf. United States v. Bringier,* 405 F.3d 310, 314–15 (5th Cir. 2005) (holding that pattern of transactions and other evidence are sufficient to support structuring conviction). Because this is such a case, the jury verdict of guilty should not have been set aside.

■■■ In a final attempt to avoid application of *Nersesian* to this case, MacPherson argues that, in *Nersesian* and many of the other cases just cited, the cash at issue was criminally derived, which is not a contention in his case. Certainly, the criminal origin of structured funds, to the extent it provides a motive for concealment from government authorities, may constitute an additional circumstance from which a jury can infer a defendant's knowledge of and intent to avoid CTR filings. But proof of criminal derivation was not necessary to secure a § 371 conviction in *Nersesian,* and this court did *not* reference this fact in concluding that the pattern of defendant's structured transactions was sufficient to support a jury inference of guilty knowledge and intent. Thus, we decline Mac-Pherson's invitation to limit *Nersesian*'s reasoning to cases involving criminal proceeds. The anti-structuring law may well have been intended to prevent criminals from concealing their illicit profits, but that is not the limit of its reach. Section 5324 makes no reference to the source of the monies at issue or to the reason why a person seeks to avoid CTR filing. Its singular focus is on the *method* employed to evade that filing requirement, *i.e.,* structuring. *See generally United States v. Gibbons,* 968 F.2d at 645 (rejecting as immaterial defendant's argument that his motive for structuring was to conceal the source of money from his ex-wife rather than the government); *cf. Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 499–500, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)

(concluding that RICO liability is not confined to businesses infiltrated by organized crime); *United States v. Morris,* 928 F.2d 504, 511 (2d Cir.1991) (holding that, although law criminalizing unauthorized access of certain federal computers was "aimed" at particular defendants, coverage was not limited to them); *United States v. Romano,* 684 F.2d 1057, 1063–64 (2d Cir. 1982) (recognizing that the prohibitions in 18 U.S.C. § 1954 extend beyond the "kickbacks" that prompted the statute's enactment). If a defendant structures cash transactions knowing that the financial institution involved is obligated to report transactions exceeding $10,000 and intending to evade that requirement, he is guilty of structuring without regard to whether the cash at issue represents criminal or lawful proceeds. More to the point, whether or not a § 5324 prosecution relates to criminal proceeds, a jury may properly consider the pattern of structuring activities and draw reasonable inferences therefrom as to whether the defendant possessed the requisite *mens rea.*

c. *MacPherson's Prior Cash Transactions Prompting CTR Filings Further Supported the Jury Inference of Knowledge*

Although the pattern of MacPherson's structured deposits, by itself, provided evidence from which a reasonable jury could have inferred his knowledge of and intent to evade currency reporting requirements, that conclusion was reinforced by circumstantial evidence that MacPherson acquired knowledge of CTR filing requirements in 1998 and 1999 when his four cash withdrawals of sums ranging from $40,000 to $80,000 prompted Citibank to file CTRs. Although no bank employee specifically recalled dealing with MacPherson at the time of these withdrawals, bank manager Edith Steuerman, who filled out part of the CTR relating to the $80,000 withdraw-

al, testified that it was her practice to prepare the document sitting across the desk from the customer while she obtained necessary identifying information from him. In initially denying MacPherson's Rule 29(a) motion, the district court concluded that Steuerman's testimony could support a jury inference that MacPherson thereby acquired knowledge of the reporting requirement for cash transactions exceeding $10,000. We agree and conclude that this evidence strongly reinforces the inference that a jury could reasonably draw from MacPherson's careful structuring of his subsequent cash deposits: he was intent on avoiding any further CTR filings with respect to his money movements.

MacPherson argues that, in fact, Steuerman's testimony only supports an inference that he knew some sort of form had to be filled out with respect to his $80,000 withdrawal. But without specific knowledge that the form was required by the government, as opposed to the bank itself, he asserts there could be no intent to evade government reporting requirements. To support this argument, MacPherson cites *United States v. Baydoun*, 984 F.2d 175 (6th Cir.1993). In that case, the defendant presented $16,700 in cash for deposit. *See id.* at 177. When told by a teller that she would have to fill out a "form" for a deposit over $10,000, the defendant reduced his transaction to $3,000, depositing the rest of the money in small amounts over the next two days. *See id.* The Sixth Circuit, observing that the bank teller had not told the defendant that the required "form" was a CTR, concluded that "[t]here is no evidence in the record that defendant had the intent to deprive the government of anything or to structure currency transactions to evade the reporting requirements of 31 U.S.C. § 5324(3)." *Id.* at 181.

We need not here decide whether we would adopt *Baydoun*'s reasoning in a case with comparable facts. The record in this case presents considerably more circumstantial evidence than was present in *Baydoun* to support an inference that MacPherson's 1998–99 bank transactions afforded him knowledge of CTR filing requirements. That evidence, viewed in the light most favorable to the government, reveals that, on January 21, 1998, Steuerman did not simply tell MacPherson that she would have to fill out some "form" in connection with his $80,000 cash withdrawal; she actually filled out that form in his presence: government Form 4789 Currency Transaction Report. Further, on August 31, 1999, when MacPherson went to three separate Citibank branches to withdraw a total of $140,000 in cash, three further CTR forms were completed. The likelihood that on these occasions, as in 1998, MacPherson witnessed the preparation of the documents, is evidenced by his production of personal identification, which was then noted on the form. More to the point, a reasonable jury could certainly infer that it was improbable in the extreme that MacPherson, a New York City police officer, would have repeatedly gone through these identification procedures (three times on one day) without knowing their purpose. Indeed, the possibility of naive ignorance is rendered all the more unlikely by the fact that MacPherson, as a licensed real estate salesperson, would himself have been required to file CTRs in connection with cash business transactions. *See generally United States v. Simon*, 85 F.3d at 911 (noting that, because defendant was a stockbroker required to file currency transaction reports in connection with his own business, "[t]he jury reasonably could have inferred that [he] possessed the knowledge and sophistication to understand that his own conduct was un-

lawful").[6] Thus, for reasons that go beyond even those articulated by the district court when it denied MacPherson's Rule 29(a) motion, we conclude that a reasonable jury could have inferred from the totality of circumstances surrounding Mac-Pherson's 1998–99 cash withdrawals that, by that time, the defendant knew that cash transactions exceeding $10,000 had to be reported to the government.

When the circumstances of MacPherson's CTR-triggering withdrawals are reviewed together with the pattern of his charged structured deposits in the light most favorable to the government, we cannot conclude that this evidence was insufficient to permit any rational jury to find that MacPherson knew of and intended to evade currency reporting requirements when he engaged in the charged structuring.

### III. *Conclusion*

To summarize, we conclude that a pattern of structured transactions, such as occurred in this case, may, by itself, permit a rational jury to infer that a defendant had knowledge of and the intent to evade currency reporting requirements. Further supporting a jury inference of knowledge in this case were the circumstances of MacPherson's past cash transactions triggering CTR filings. Because the totality of this circumstantial evidence was sufficient to establish the elements of knowledge and intent required to convict Mac-Pherson of structuring in violation of 31 U.S.C. § 5324(a)(3), the jury verdict of guilty should not have been set aside nor a judgment of acquittal entered by the court. Accordingly, we REVERSE the judgment of acquittal and REMAND this case to the district court with directions that it rein-

state the jury verdict, proceed to sentencing, and enter a judgment of conviction.

---

**6.** In *Simon,* as in this case, there appears to have been no evidence that the defendant had actually filed any CTRs in his professional capacity.